BASCHAB, Judge.
On September 17, 1986, the appellant was convicted of two counts of capital murder for the killings of John Davidson and Thomas Wayne Vason. The murders were made capital because he committed them during the course of a robbery. See § 13A-5-40(a)(2), Ala.Code 1975. By a vote of 10-2, the jury recommended that he be sentenced to death. On December 15, 1986, the trial court accepted the jury’s recommendation and sentenced him to death. We affirmed his convictions and sentences, see Hinton v. State, 548 So.2d 547 (Ala.Crim.App.1988); the Alabama Supreme Court affirmed his convictions and sentences, see Ex parte Hinton, 548 So.2d 562 (Ala.1989); and the United States Supreme Court denied his petition for certio-rari review, see Hinton v. Alabama, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). This court issued a certificate of judgment on July 6, 1989.
On August 15, 1990, the appellant filed a Rule 32 petition, challenging his conviction and sentence, which he subsequently amended. After the State responded, the circuit court conducted an evidentiary hearing and denied the petition. This appeal followed.
 The appellant raises several arguments, including claims that his attorneys rendered ineffective assistance during the proceedings. In reviewing the circuit court’s rulings on the appellant’s arguments, we apply the following principles:.
“ ‘ “[T]he plain error rule does not apply to Rule 32 proceedings, even if the case involves the death sentence.” Thompson v. State, 615 So.2d 129 (Ala.Cr.App.1992).’ Cade v. State, 629 So.2d 38, 41 (Ala.Crim.App.1993), cert. denied, [511] U.S. [1046], 114 S.Ct. 1579, 128 L.Ed.2d 221 (1994).
“In addition, ‘[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.’ State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993).”
Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995).
“To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) that his counsel’s performance was deficient and (2) that he was prejudiced as a result of the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
“‘The appellant must show that his counsel’s performance was unreasonable, considering all of the attendant circumstances.... “[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.’
“Duren v. State, 590 So.2d 360, 362 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, [503] U.S. [974], 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
*258 “When this court is reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel’s conduct was appropriate and reasonable. Luke v. State, 484 So.2d 581, 534 (Ala.Cr.App.1985). The burden is on the appellant to show that his counsel’s conduct was deficient. Luke.
“ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
“Strickland, 466 U.S. at 689, 104 S.Ct. at 2065-66. (Citations omitted.) Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987).
“Initially we must determine whether counsel’s performance was deficient. We must evaluate whether the action or inaction of counsel of which the petitioner complains was a strategic choice. ‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable....’ Lawley, 512 So.2d at 1372. This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance. Falkner v. State, 586 So.2d 39 (Ala.Cr.App.1991).”
Hallford v. State, 629 So.2d 6, 8-9 (Ala.Crim.App.1992).
“In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs. Id. at 697, 104 S.Ct. at 2069. In fact, the Court explained that ‘[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.’ Id. We defer to this guidance and address the ‘prejudice’ prong, for ‘[w]ith respect to the prejudice component, the lack of merit of [Thomas’s] claim is even more stark.’ Id. at 699, 104 S.Ct. at 2070.”
Thomas v. State, 511 So.2d 248, 255 (Ala.Crim.App.1987) (footnote omitted).
“Furthermore, to render effective assistance, an attorney is not required to raise every conceivable constitutional claim available at trial and on appeal. Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994); McCoy v. Lynaugh, 874 F.2d 954, 965-66 (5th Cir.1989). Rather, counsel must be given some discretion in determining which claims possibly have merit, and thus a better chance of success, and *259 which claims do not have merit, and thus have little chance of success. Heath v. State, 536 So.2d 142 (Ala.Cr.App.1988); Smith v. Murray, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); Engle v. Isaac, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).”
Davis v. State, 720 So.2d 1006, 1014 (Ala.Crim.App.1998). Finally,
“[t]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992)(‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted).
The following facts, as set forth in this court’s opinion on direct appeal, are helpful to an understanding of this case:
“The two robbery-homicides which are the basis for the charges, which were brought under separate indictments, occurred on separate dates. The first robbery-homicide occurred on February 23, 1985, at Mrs. Winner’s fried chicken restaurant, located at 737 29th Street, South, in Birmingham. This restaurant is approximately two and one-half blocks from the Red Mountain Expressway. Shortly after midnight on the morning of February 24, 1985, Thomas Elliott, an exterminator, arrived at Mrs. Winner’s. Finding the door unlocked, Mr. Elliott entered the restaurant and called out. Mr. Elliott saw a light on in the back of the restaurant and headed toward it. Next to the cooler he found John Davidson, the restaurant’s assistant manager, lying in a pool of blood. Mr. Davidson had been shot and was bleeding very badly. Mr. Davidson’s false teeth were on the floor of the cooler. Blood was all over the door of the cooler. Mr. Elliott immediately called the 911 emergency number and summoned the Birmingham Police Department, as well as the rescue facilities of the Birmingham Fire Department, to the restaurant.
“After assistance had been summoned, Mr. Davidson got up and started walking around the restaurant, but was unresponsive to Mr. Elliott’s presence. Because he was frightened, Mr. Elliott went outside the restaurant to await the arrival of the paramedics. Moments later, the police and paramedics arrived, almost simultaneously. The paramedics administered emergency treatment .to Mr. Davidson, then transported him to Medical Center East Hospital.
“While the paramedics were attending Mr. Davidson, the police began their investigation of the incident. In the course of their investigation, the police determined that there was no sign of forced entry into the restaurant. However, the top of the safe was off and the safe was empty. A review of the restaurant’s business records revealed that *260 $2,100 was missing from the safe. No fingerprints were found at the scene. Mr. Davidson’s truck was parked outside the restaurant and his wallet was on the front seat of the truck. Based on them investigation, the police concluded that Mr. Davidson, who had been alone in the restaurant, was accosted by an unknown gunman as he left the restaurant, forced to re-enter the restaurant, open the safe, and give the armed robber the cash contents of the restaurant’s safe, and was then directed into the restaurant’s cooler and shot twice in the head by the unknown robber.
“Meanwhile, the victim, Mr. Davidson, was undergoing extensive surgery at Medical Center East, but to no avail; he died on February 25, 1985. During the course of the surgery, a .38 caliber bullet was removed from Mr. Davidson’s head. This projectile was subsequently toned over to the Alabama Department of Forensic Sciences for its examination. Dr. Robert Brissie, chief coroner of Jefferson County, performed the autopsy on the victim. His examination revealed that Mr. Davidson suffered two gunshot wounds to the head. One bullet penetrated beneath his right eye and the other bullet entered approximately seven inches from the top of his head. Both wounds were to the right side of Mr. Davidson’s face. It was Dr. Bris-sie’s opinion that Mr. Davidson died as a result of gunshot wounds to his head. During the course of the autopsy, the second bullet was removed from the victim’s head and turned over to the Department of Forensic Sciences for examination.
“The second robbery-homicide occurred on July 1, 1985, at the Captain D’s restaurant in Woodlawn, in the eastern section of Birmingham. This restaurant is located two to two and one-half blocks from the interchange of Interstate Highways 20 and 59. Earnest Horn left his job at Captain D’s on the night of July 1, 1985, around 11:30 p.m., leaving the assistant manager, Thomas Wayne Vason, alone in the restaurant counting the money taken in that day arid preparing to call in his report of the day’s sales to the Shoney’s regional office. (Captain D’s restaurants are a subsidiary of the Shoney’s restaurant chain.) When Mr. Horn left the restaurant the alarm system was plugged into the phone. At approximately 12:45 a.m. on July 2, 1985, Mr. Vason called in his sales total to the regional office, then left the restaurant.
“At 7:45 a.m. on July 2, 1985, Reuben Valdez, manager of the Captain D’s in Woodlawn, arrived at the restaurant in preparation for the day’s opening. He noticed Mr. Vason’s car, but at the time thought nothing of it. Mr. Valdez entered the restaurant and saw that the safe was open. He then saw Mr. Va-son’s body lying in the cooler. Mr. Va-son had been shot and appeared dead to Mr. Valdez. .The police were immediately summoned. Mr. Valdez then called the area supervisor of Shoney’s to report the crimes. Birmingham police officers first arrived at approximately 7:50 a.m. Additional investigators arrived shortly thereafter. Police found on the floor next to the open safe a piece of paper on which was written the combination to the safe. Mr. Vason’s wallet was also found nearby on the desk; it contained $165 in bills of various denominations. A review of the business records revealed that $650 was missing from the safe. Additionally, the telephone alarm system was unplugged. There was, again, no sign of forced entry into the restaurant. The side kitchen door to the restaurant, the one nearest to the safe (on which a smudged *261 fingerprint was found), could be opened only from the inside or the outside with a key. Mr. Vason’s keys were found in the kitchen area. Based on their investigation, the police concluded that Mr. Vason, upon leaving the restaurant, was accosted by an unknown gunman and forced to re-enter the restaurant, open the safe, and give the armed robber the cash contents of the restaurant’s safe, and then was directed into the restaurant’s cooler and fatally shot twice in the head by the unknown robber.
“Dr. Pat Garceau, a medical examiner in the Jefferson County Coroner’s Office, determined that Mr. Vason was dead at the scene of the crime. Dr. Garceau’s autopsy of the victim revealed that Mr. Vason had suffered two gunshot wounds to the head. One gunshot wound entered the right cheek of Mr. Vason, and the other entered one and one-half inches from the top of his head. Further testing performed on the victim by Dr. Garceau determined the time of death to be between 12:30 a.m. and 2:30 a.m. on July 2, 1985. It was Dr. Gar-ceau’s opinion that Mr. Vason’s death was the result of a gunshot wound which penetrated his brain.
“During the course of the autopsy, two .38 caliber bullets were recovered from the body of Mr. Vason. Both bullets were turned over to the Department of Forensic Sciences for its examination. The .38 caliber bullets which were recovered from the'bodies of Mr. Davidson and Mr. Vason were later examined by firearms experts in the Department of Forensic Sciences to determine if they had been fired from the same weapon. Examination by these experts revealed that the bullets taken from the head of Mr. Davidson and the bullets recovered from the head of Mr. Vason were fired from the same weapon. Further similarities were present, in that both victims had been shot twice in the head, and both victims, at some time during the course of the robbery, were placed in the walk-in cooler of the restaurant. Moreover, during the investigation of both robberies, fingerprint technicians examined areas of the restaurant and were unable to find any latent fingerprints which could lead to the arrest of a suspect. Thus, without any [1] further leads, the police department’s investigation was at a standstill.
“Later in the month of July, however, Birmingham police investigators working on these cases got their first big break. On July 25,1985, Sidney Smoth-erman, who was a night manager of Quincy’s Family Steak House restaurant in Bessemer, survived a robbery which fit the pattern of the Mrs. Winner’s and Captain D’s robbery-homicides. Mr. Smotherman told Bessemer police he was working the night shift at Quincy’s in Bessemer on July 24, 1985. Quincy’s is located approximately four to five blocks from Interstate 59. Upon closing, however, several employees who wére on the clean-up detail that night exited the building at the same time as Mr. Smotherman, approximately 12:14 a.m. on July 25, 1985. Mr. Smotherman got into his 1985 silver Pontiac Fiero and drove to the nearby Food World. Two other employees of Quincy’s also stopped by Food World after work to pick up some items before going home for the night. One of the employees noticed a ‘strange looking guy[1] inside the store. The man seemed strange because he was not shopping and kept putting his hand up to his face in an apparent attempt to hide his face. This strange man did not make a purchase, but instead followed Mr. Smotherman outside the store. The receipt from Mr. Smotherman’s purchases showed that *262 Mr. Smotherman exited Food World at 12:26 a.m. on July 25,1985.
“After leaving Food World, Mr. Smotherman got into his car and began driving home. He had gone less than a mile down the road, when his car was bumped from the rear while he was stopped at a traffic light. Mr. Smother-man and the other driver, whom he identified as the defendant, got out of their cars to survey the damage. Having satisfied himself that there w[a]s no damage to his car, Mr. Smotherman got back into his car and prepared to drive off, but was prevented from ■ doing so when the other man pulled a gun on him. The gunman ordered Mr. Smoth-erman to get into the front seat of the gunman’s car, a large, dark-colored, mid-70’s model. After parking Mr. Smotherman’s car, the gunman walked back to his car carrying the gun and a white shirt or towel in his hand. He told Mr. Smotherman that he had been waiting for him and' that he had to be in Atlanta in three hours.
“The gunman then drove to Quincy’s, pointed his gun at Mr. Smotherman, and told him they were going inside. Mr. Smotherman was ordered to get the gunman everything out of the safe except the pennies. After he had all the money, the gunman asked Mr. Smother-man where the cooler was located. Mr. Smotherman was then instructed to enter the cooler. Remembering from news accounts of the Mrs. Winner’s and Captain D’s robbery-homicides that the managers had been killed inside the coolers, Mr. Smotherman realized that this could be the same person and very likely he was going to be killed. He requested that the gunman put him in the storage room where the canned goods and vegetables were kept, as it was not as cold in that room. The gunman agreed to Mr. Smotherman’s request and ordered him into the storeroom. As Mr. Smotherman walked into the room, he turned and saw the gunman pointing a pistol at his head. He ducked and threw his hands up just as two shots were being fired. As he was falling, he kicked the door shut, and as it closed it locked automatically, thus preventing the robber from coming into the room. One of the bullets hit Mr. Smoth-erman in the finger and then grazed his head. After waiting about ten minutes, Mr. Smotherman left the storeroom, went next door to the Motel 6, and called the police. Mr. Smotherman was taken to the hospital for treatment. While medical personnel were examining and treating Mr. Smotherman’s injuries, they discovered that one of the bullets fired at him by the robber had ricocheted off of something and fallen into his shirt pocket. This bullet, along with the bullet recovered from the storeroom, was turned over to the Department of Forensic Sciences for its examination. Upon examination, it was determined by the forensic experts that these two bullets were fired from the same weapon that had fired the bullets which caused the deaths of John Davidson and Thomas Wayne Vason.
“Police investigators could not lift any fingerprints from Mr. Smotherman’s car or from inside the restaurant. Mr. Smotherman was, however, able to provide police with a detailed description of the robber and assisted in constructing a composite drawing of the suspect. On July 30, 1985, Mr. Smotherman was shown a photographic array, and within a few seconds he picked up the defendant’s photograph and stated, ‘This is him.’ At trial Mr. Smotherman identified the defendant as the gunman who robbed and then shot him. Mr. Smoth-erman’s co-worker also identified the de *263 fendant Anthony Ray Hinton as the ‘strange’ man he had seen in Food World just minutes before the robbery/shooting.
“Police investigators also discovered that approximately two weeks before the Quincy’s robbery, the defendant had approached Reginald White, an employee of Quincy’s in Bessemer, in Hoover at the location of his second job. Mr. White had not seen the defendant in some four years. At the time they had last seen each other, the defendant was a frequent patron of Quincy’s. The defendant asked Mr. White if he was still working at Quincy’s. Mr. White replied, ‘yes.’ The defendant also asked if ‘Mr. Don’ was the manager. Mr. White replied no, that the Quincy’s in Bessemer had a new manager who had just bought a new Fiero. The defendant also inquired as to what time the restaurant closed.
“On July 31, 1985, Sergeant Clyde Amberson of the Jefferson County Sheriffs Department went to the defendant’s home in Walker [Cjounty. Sergeant Amberson was accompanied by an investigator from the Walker County District Attorney’s Office. The defendant was informed that they had a warrant for his arrest, placed him under arrest on a robbery charge, and informed him of his Miranda rights. The defendant gave permission for his ear and his bedroom to be searched. No incriminating evidence was found in either place. Sergeant Amberson asked defendant’s mother if she had a gun in the house. She answered affirmatively. However, when she opened the kitchen drawer to get the gun, it was gone. She then went into the back bedroom and returned with a pistol. Mrs. Hinton gave the officers the gun and two bullets taken from the gun.
“The gun given to the police investigators by the defendant’s mother, a .38 caliber Smith & Wesson pistol, was turned over to the State Department of Forensic Sciences for its examination. As has been previously stated, two bullets were fired at each of the three victims involved in the aforementioned robberies. Each of these bullets was recovered and turned over to the Department of Forensic Sciences for examination. Expert examination of these bullets established that all six of the bullets were fired through the same weapon. The gun recovered at the defendant’s home was test-fired by these same forensic experts and it was determined that this was the weapon through which all of the bullets recovered from these three robbery investigations were fired. The defendant was then arrested and charged with capital murder in the deaths of John Davidson and Thomas Wayne Vason.
“The defendant maintained that at the time of the Quincy’s robbery he was at his job at the Bruno’s warehouse in Ens-ley, and at trial he presented testimony to that effect. Further testimony was presented by the defendant himself, who denied any involvement with any of the three incidents. The defense also called expert witness Andrew Payne, a consulting engineer with some expertise in firearms identification. Mr. Payne stated that he examined each of the bullets recovered from the three incidents and the weapon recovered from the defendant’s home. It was his conclusion that no determination could be made that the bullets had been fired from that weapon.”
Hinton, 548 So.2d at 550-53.
I.
The appellant’s first argument is that he is factually innocent. With regard *264 to newly discovered evidence, Rule 32.1, Ala. R.Crim. P., provides, in pertinent part:
“Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:
[[Image here]]
“(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
“(1) The facts relied upon were not known by the petitioner or the petitioner’s counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
“(2) The facts are not merely cumulative to other facts that were known;
“(3) The facts do not merely amount to impeachment evidence;
“(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
“(5) The facts establish that the petitioner is innocent of the crime for which the petitioner was convicted or should not have received the sentence that the petitioner received.”
Rule 32.1, Ala. R.Crim. P.
“It is well-settled under Alabama law that ‘[t]he granting or denying of a new trial on the basis of newly discovered evidence rests largely in the trial court’s discretion. Welch [v. Jones, 470 So.2d 1103 (Ala.1985) ]. The exercise of that discretion depends largely upon the credibility of the alleged new evidence. McDonald v. State, 451 So.2d 440 (Ala.Crim.App.1984).’ Hamm v. Hudson Industries, Inc., 507 So.2d 933, 935 (Ala.Civ.App.1986), rev’d, Ex parte Hamm, 507 So.2d 936 (Ala.1987). ‘The appellate courts look with disfavor on motions for new trial based on newly discovered evidence and the decision of the trial court will not be disturbed absent abuse of discretion.’ Sexton v. State, 529 So.2d 1041, 1052-53 [ (Ala.Crim.App.1988) (citations omitted). In Hope v. State, 521 So.2d 1383 (Ala.Crim.App.1988), this Court affirmed the trial court’s judgment denying the appellant’s Rule 20 petition based on newly discovered evidence, where the trial court did not find the witnesses presenting the new evidence to be credible. This Court, per Judge Bowen, held as follows:]
“ ‘Here there is no evidence that the trial judge abused his discretion in denying a new trial on the grounds of newly discovered evidence based on the lack of credibility of the witnesses presenting the new evidence. Williams v. State, 489 So.2d 4, 5-6 (Ala.Cr.App.1986). “One condition of the trial court’s granting a new trial on the basis of newly discovered evidence is that the court must believe the evidence presented at the hearing.” McDonald v. State, 451 So.2d 440, 442 (Ala.Cr.App.1984).
“ ‘Since a coram nobis petition “serves as a motion for a new trial on the ground of newly discovered evidence[,]” Groce v. State, 48 Ala.App. 709, 711, 267 So.2d 499 (1972), there exists a presumption favoring the correctness of the trial court’s ruling on a petition for writ of error coram nobis. Brooks v. State, 248 Ala. 628, 631, 29 So.2d 4 (1947). “The granting of a *265 motion for a new trial was addressed to the sound discretion of the trial court and will not be revised on appeal unless it clearly appears that the discretion has been abused.” Nichols v. State, 267 Ala. 217, 228, 100 So.2d 750 (1958). “The trial court is in the best position to determine the credibility of the new evidence.” Isom v. State, 497 So.2d 208, 212 (Ala.Cr.App.1986). “It is basic that in consideration of the sufficiency or insufficiency of the evidence to support the verdict, we cannot weigh[ ] the evidence or test the credibility of witnesses.” Walker v. United States, 301 F.2d 94, 95 (5th Cir.1962).’
“Id., at 1387-88.”
Johnson v. State, 564 So.2d 1019, 1022 (Ala.Crim.App.1989).
A.
Initially, the appellant contends that the bullets that were recovered from the three crime scenes cannot be linked to a single gun or to the • revolver officers recovered from his mother.
At trial, the State presented the following evidence:
David Higgins testified that he was a firearm and toolmark examiner with the Alabama Department of Forensic Sciences; that he had been doing firearm and toolmark examinations since the early 1970s; that he had testified as an expert on quite a few occasions; and that he worked with Lawden Yates. He also testified that, initially, a different revolver was compared to the Davidson bullets and that testing did not reveal a match.
Higgins testified that, in conducting examinations, he test-fires bullets and compares them to each other to look for repetitive and accidental markings; that repetitive markings are those that are characteristic for a particular gun barrel based on something permanent within the barrel of the gun through manufacture, use, or abuse; that such marks are left on the . sides, or bearing surface, of the bullet as it passes through the barrel of the gun; that repetitive markings are the ones that are used to determine whether a bullet was fired from a particular gun; that a gun barrel also leaves microscopic striations; that accidental markings are also sometimes made by things such as a fleck of metal from a previously fired bullet; and that accidental markings are not repetitive. He also testified that there are spiral cuts down the barrel called lands and grooves, or rifling; that the high place is the land, and the low place is the groove; that lands and grooves vary in number and turn either to the right or the left; that the lands and grooves leave marks on a bullet’s bearing surface as it travels through the barrel; and that the pattern from barrel to barrel is unique. He further testified that he examines bullets using a comparison microscope; that such a microscope allows a person to look at two bullets at the same time side by side; and that he can determine that bullets match if the lands and grooves and microscopic striations or scratches on the bullets line up the same way on the bullets.
Higgins testified that, on July 31, 1985, he examined the two Davidson bullets and the revolver that was recovered from the appellant’s mother; that he test-fired the revolver and recovered the bullets; that he compared the test bullets to each other to determine what repetitive markings the revolver left on the bullets; that he compared the test bullets to the Davidson bullets using a comparison microscope; and that he concluded that there was a match, or that the Davidson bullets had *266 been fired from the revolver that was recovered from the appellant’s mother.
On cross-examination, Higgins admitted that the condition of a bullet can affect his ability to make a comparison; that test bullets are not usually marked, mutilated, or deformed by outside influences, but evidence bullets usually are; that firing a gun could eventually alter the barrel; that a barrel that has been altered will not leave clean marks like a clean barrel would; and that the Davidson bullets had some deformities. He also admitted that the revolver that was recovered from the appellant’s mother was old; that, when it was manufactured, it used corrosive primers; and that the inside of the barrel can be altered if corrosive primers are used and the barrel of the gun is not cleaned for a long time.
Lawden Yates testified that he was a firearm and toolmark examiner with the Alabama Department of Forensic Sciences; that he had worked with the department since 1972; and that he had testified as an expert on many occasions. He also testified that gun barrels have lands and grooves and that, no matter how careful the manufacturer is, there are microscopic defects in the areas of the lands and grooves; that each barrel has its own microscopic imperfections and is unique; that, as a barrel is subjected to extensive wear over a long period of time, some markings will wear off and others will be produced; that striations are microscopic defects or scratches; and that it would be impossible to determine whether bullets matched without using a comparison microscope.
Yates testified that he initially compared the two Vason bullets to another revolver and determined that there was not a match. He also testified that, on July 3, 1985, he compared the Davidson and Va-son bullets and determined that they had all been fired through the same barrel; that, on July 29, 1985, he compared the Davidson, Vason, and the two Smotherman bullets and determined that they had all been fired through the same barrel; and that he compared the Davidson, Vason, and Smotherman bullets to the test bullets and determined that the Davidson, Vason, and Smotherman bullets had been fired from the revolver that was recovered from the appellant’s mother. Yates explained that he reached his conclusion based on the fact that the bullets had the same microscopic striations or scratches; that they had the same class characteristics— .38 caliber, skid marks from a revolver, and a problem with alignment of the cylinder; and that the revolver that was recovered from the appellant’s mother was a .38 revolver that had an alignment problem with the chamber of the cylinder.
At trial, the defense presented the following evidence:
Andrew H. Payne, Jr., testified that he was a consulting engineer and that he had studied firearms and projectiles; that he was in the gunnery program and became an instructor while he was in the military on active duty; that, when he entered the military reserves, he continued to be involved with firearms; that he was involved with the design of gun barrels for the military almost from the time he entered the military in- 1942; that he was also involved with the testing of firearms and bullets on an almost daily basis; that he had examined bullets that had been fired from handguns; that he was a member of the weapons evaluation board for the Air Force for about five years; and that, at various times during his military career, he served as the director of a technical services laboratory, director of the armament development laboratory, and technical assistant to the deputy chief of staff for *267 research and technology.[1] He also testified that, based on his training and experience, he was familiar with toolmarks; that he had testified as an expert witness on firearm identification; and that he had previously given opinions or advice concerning toolmarks and toolmark identification. He further testified that he had used a comparison microscope to look at bullets thousands of times.
Payne testified that, in July and August 1986, he examined the Davidson, Vason, and Smotherman bullets, the test bullets, and the revolver that was recovered from the appellant’s mother; that the revolver was at least 40 or 50 years old; that, when the revolver was manufactured, chlorate primers were normally used; that chlorate primers left salt deposits in the barrel that would form acids that were corrosive to the barrel and could cause rust; that, over time, such corrosion can substantially obliterate a barrel’s toolmarks; that it appeared to him that corrosive ammunition had been fired through the revolver; that the revolver’s toolmarks had been substantially dulled and were not distinct, that it was almost bare of lands and grooves, and that there were actually holes eaten back in several places; and that he tried to get a reading on the width of the lands and grooves, but could only get an estimate because of the worn condition of the edges. He also testified that, based on his examination, the Davidson, Vason, and Smother-man bullets had not been fired from the revolver that was recovered from the appellant’s mother.
On cross-examination, Payne admitted that he had difficulty using Yates’ comparison microscope because he had not previously used one from that particular manufacturer [2]; that he thought he had testified in only two previous criminal cases; that he did not know whether or not he would be paid for his work on the case; and that his vision was impaired because he had only one eye.
During the Rule 32 proceedings, the appellant’s counsel took the depositions of Higgins and Yates and introduced them into evidence during the evidentiary hearing. Their testimony from their depositions follows:
Higgins testified that he did not believe that Payne had the same qualifications he and Yates had; that Payne did not know how to turn on their microscope, but took over after that; and that Payne may have had difficulty adjusting the microscope, but that could happen to anyone who was not familiar with their particular microscope. He also testified that the office uses worksheets when conducting an examination; that, for bullets, those worksheets include spaces for information about the source, the diameter, the number of *268 lands and grooves, the direction of twist, the width of the land impression, the width of the groove impression, the weight, the type, the condition, the number of canne-lures, the markings, and the make; and that the worksheets also had a place for information about test bullets.
Higgins testified that he and Yates looked at each other’s evidence in the Davidson and Vason cases because the facts sounded similar; that they determined that the bullets had been fired from the same gun; and that, after they received the revolver that was recovered from the appellant’s mother, they test-fired it. He also testified that the Davidson bullets were mutilated and had apparently been fired from a gun that was out of time, or in which the cylinder did not line up perfectly with the barrel; that the lands and grooves were not really discernible, but the bullets both had a skid caused by the gun being out of time; that the twist and the land and groove widths were not really discernible; and that, because of these deficiencies, when he initially examined them, he could not determine whether or not they were fired from the same gun because of the mutilation. Higgins further testified that, after he received the revolver that was recovered from the appellant’s mother, he obtained test bullets; that the test bullets had enough striations, or microscopic markings from the inner surface of the barrel, to allow him to make a comparison to the Davidson bullets; and that he concluded that the Davidson bullets had been fired from the revolver. Finally, he testified that the worksheets did not include information about certain class characteristics or timing problems; that he did not reach his conclusion that the bullets were fired from the revolver based on any class characteristics; and that he based his conclusion that the bullets were fired from the revolver on the unique or individual microscopic striations he observed on the Davidson and the test bullets.
Yates testified that he was not impressed with Payne’s capabilities in firearm and toolmark identification; that he seemed to have only a limited ability to do the type of work he and Higgins were doing; that he did not know how to use their microscope and asked for help several times; and that the tools he brought did not seem to be appropriate. He also testified that, while he is conducting an examination, he uses a worksheet to make notes; that he makes notes on the worksheet for his convenience to assist in making a written report; and that,the written report is prepared later and sent to the relevant parties.
Yates testified that Higgins initially examined the Davidson bullets, and he initially examined the Vason and Smother-man bullets; that, before the revolver was located, they compared the Davidson, Va-son, and Smotherman bullets to each other and determined that they had all been fired from the same gun; and that he later noted that the revolver was out of time. He also testified that he used dashes and question marks on his worksheets in some places because some of the class characteristics of various bullets were not readily discernible due to mutilation; that there were some areas of lands and grooves that were discernible on the bullets, but they could not be measured accurately and meaningfully due to mutilation; that he concluded that the bullets had been fired from the revolver based on striations, or microscopic markings from the inside of the barrel; and that he had examined the entire bearing surface of each bullet for striations. Finally, he testified that the test bullets were taken to the court for the trial, that they were not admitted into evidence, and that they were apparently lost.
*269 During the evidentiary hearing, the appellant presented the following witnesses:
Lannie Emanuel testified that he is a firearm and toolmark expert at the Southwestern Institute of Forensic Sciences in Dallas, Texas; that he has had extensive training and has been doing firearm and toolmark examinations since 1979; that he is a member of the Association of Firearm and Toolmark Examiners (“AFTE”); and that he has conducted thousands of examinations and has testified in more than 250 cases. He also testified that he became involved in this case in 1992; that he and Ray Cooper initially examined a gun and some bullets in Alabama; and that he later examined the gun and bullets in Texas.
Based on his examination, Emanuel testified that he concluded that the Davidson bullets (State’s Exhibits 2 and 8) had been fired from the same gun; that he was not able to determine whether or not the Va-son bullets (State’s Exhibits 23 and 24) had been fired from the same gun; and that he was not able to determine whether or not the Smotherman bullets (State’s Exhibits 54 and 55) had been fired from the same gun. He also testified that he performed a microscopic comparison of the Davidson, Vason, and Smotherman bullets and test bullets that were fired from the revolver that was recovered from the appellant’s mother; that he could see lands and grooves on the test bullets, but could not see them on the Davidson, Vason, and Smotherman bullets; that all of the bullets that were test fired from the revolver that was recovered from the appellant’s mother had a land and groove signature of five right; that he examined two bullets that were labeled “pre-cleaning tests”; and that he could not find sufficient striations to convince him that any of the Davidson, Vason, or Smotherman bullets had been fired from the revolver that was recovered from the appellant’s mother. (R. 76.) Emanuel further testified that the Smoth-erman bullets appeared to have been fired from a revolver that was “severely out of time”; that the revolver that was recovered from the appellant’s mother had a timing problem, but it did not produce bullets that looked like the Smotherman bullets; and that, even when he made the revolver fire as far out of time as he could,[3] it still did not produce the degree of damage one of the Smotherman bullets had. (R. 81.) During the appellant’s direct examination of Emanuel, the following also occurred:
“[THE APPELLANT’S COUNSEL:] ... Is [the revolver that was recovered from the appellant’s mother] capable, mechanically capable, of producing a bullet like the bullet recovered in State’s Exhibit 54 [one of the Smotherman bullets]?
“[EMANUEL:] Based on the testing that we’ve conducted, if it’s fired normally without some type of external manipulation, no, I don’t believe it’s capable.
“[THE APPELLANT’S COUNSEL:] How about even when it’s manipulated as you did in.your laboratory, were you able to get a bullet that was comparable to the bullet in State’s Exhibit 54?
“[EMANUEL:] No, we were not.”
(R. 86.)[4]
On cross-examination, Emanuel admitted that the Davidson bullets were de *270 formed and that the deformities limited his ability to determine class characteristics such as lands and grooves; that bullets fired from the same gun would not always have deformities on the same portion of the bullet; that the revolver that was recovered from the appellant’s mother had wear and tear, but he could not determine whether corrosive primers or something else caused it; that his partner first test-fired the revolver that was recovered from the appellant’s mother on April 21, 1994; and that he made his determinations about the - Davidson, Vason, and Smotherman bullets in 1994. He also testified that there were scratches and marks on the bullets that could be observed using a comparison microscope, that he had used a comparison microscope, and that he still could not find sufficient striations to convince him that the bullets had been fired from the revolver that was recovered from the appellant’s mother. However, he admitted that it was not impossible to use a microscopic comparison to make a match on a bullet that had been deformed to the extent that lands and grooves were not discernible. Although he testified that there were not sufficient individual marks to determine that the Vason bullets were fired from the same gun and the Smother-man bullets were fired from the same gun, he also admitted that he could not conclude that the Vason bullets were not fired from the same gun and that the Smother-man bullets were not fired from the same gun.
Raymond Cooper testified that he is a firearm and toolmark examiner with the Southwestern Institute of Forensic Sciences in Dallas, Texas; that he has had extensive training and has been doing firearm and toolmark examinations since 1972; and that he has conducted more than 5,000 examinations and has testified between 250 and 350 times. He also testified that he performed examinations of the revolver that was recovered from the appellant’s mother and various bullets from this case in both Alabama and Texas.
Based on his examination, Cooper testified that he concluded that the Davidson bullets had been fired from the same gun; that he could not determine whether or not the Vason bullets had been fired from the same gun; and that he could not determine whether or not the Smotherman bullets had been fired from the same gun. He also testified that the revolver that was recovered from the appellant’s mother showed some out of time problems in certain instances[5];- that he could not determine that the Davidson, Vason, or Smoth-erman bullets had been fired from the revolver; and that he manipulated the revolver so that it would fire as far out of time as possible, but he still could not make it produce a bullet that would match the severe out of time characteristics that he saw in the Smotherman bullets. Dur *271 ing Cooper’s testimony about this process, the following occurred:
“[COOPER:] Well, [I] basically threw all caution to the wind, because any time that you take a weapon and intentionally take it out of time, it’s got to be done by holding it. So as Mr. Emanuel stated earlier, if you take it — if something happens and it’s too far out of alignment when it fires, not too good results can happen from that.
“But that’s what I did. I intentionally took the weapon out of time to see how far we could take it out of time and start back to the point to where we could get a detonation of that cartridge.
“[THE APPELLANT’S COUNSEL:] And taking this weapon and putting it as far out of time as you possibly could, were you able to produce a bullet that would match the kind of severe out of timing that we see in State’s Exhibit 54?
“[COOPER:] No. [T]he problem ... with doing that is that you’re manually holding that cylinder out of time. So when that cartridge detonates and that bullet starts down that barrel, it’s going to hit the forcing cone first. And what it does when it hits that forcing cone, it forces that cylinder over so that it can align itself with the barrel. So I couldn’t — I could not physically hold that cylinder out of time in order for that bullet to extrude like it did in 54.
“[THE APPELLANT’S COUNSEL:] In your opinion, does the mechanical condition of this gun make it impossible for it to produce the kind of bullet we see in State’s Exhibit 54?
“[COOPER:] In the testing that I was involved in, I could never reproduce what had happened in'State’s Exhibit 54 and 55.”[6]
(R. 120-21.) Cooper further testified that the Davidson, Vason, and Smotherman bullets did not show class characteristics, but the test bullets that were fired through the revolver that was recovered from the appellant’s mother showed class characteristics of five right.
On cross-examination, Cooper admitted that his testing and manipulations of the revolver that was recovered from the appellant’s mother were limited by concerns for personal safety and limited by “the hand strength of holding back a bullet that is exiting at a high rate of speed forcing the chamber back into alignment.” (R. 122.)[7] He also admitted that he could not *272 make a determination that the Vason bullets had not been fired.from the same gun and that the Smotherman bullets had not been fired from the same gun; that there were not sufficient striations or class characteristics for him to conclude that any of the Davidson, Vason, or Smotherman bullets had been fired from the revolver that was recovered from the appellant’s mother; and that he agreed with the State’s experts that there were not sufficient markings on the surface to make class characteristic determinations.
John H. Dillon, Jr., testified that he is a self-employed forensic consultant with a specialty in firearm and toolmark identification and shooting reconstruction; that he has had extensive training and has been doing examinations since 1976; that he has trained many other firearm and toolmark examiners; that he has testified as an expert in more than 70 cases; and that he is a member and immediate past president of AFTE. He also testified that he became involved with this case in 1999; that he reviewed documentation and the trial and deposition testimony of Yates and Higgins; and that he independently examined the bullets and the revolver that were involved in this case. Based on his examination, he testified that there were sufficient marks for him to conclude that the Davidson bullets had been fired from the same gun; that there were not sufficient marks on the Vason bullets to determine that they had been fired from the same gun;, and that there were not sufficient marks on the Smotherman bullets to determine that they had been fired from the same gun. He also testified that the revolver that was recovered from the appellant’s mother had suffered abuse and fired out of time and that he could not determine whether or not the Davidson, Vason, and Smotherman bullets had been fired from that revolver. Finally, he testified that disagreement among examiners is possible, but not very common.[8]
*273 In its order on the petition, the circuit court found as follows:
“Hinton alleges that newly discovered material facts prove that the gun recovered from his mother’s home was not the gun that fired the bullets in the Davidson/Vason murders and the Smotherman robbery....
“... Hinton failed to meet his burden of proving these allegations under Rule 32.3 because he did not present any evidence proving that the gun recovered from his mother’s house was not the gun that fired the bullets in the Davidson/Vason murders and the Smother-man robbery. In addition, these allegations fail to qualify as ‘newly discovered material facts’ under Alabama Rule of Criminal Procedure 32.1(e) because the evidence presented at the evidentiary hearing was cumulative to the evidence that was presented at trial and, thus, it would not have changed the outcome of the trial.
“At trial, Hinton presented the testimony of Andrew H. Payne, Jr., a consulting engineer who studied firearms and projectiles. (T.R. 1571-1667) Since this trial, Mr. Payne has been qualified as an expert witness in firearms and projectiles in several courts across Alabama. Mr. Payne testified that the type of bullets fired from the gun recovered at Hinton’s mother’s house used a corrosive primer that eventually corroded the striations inside the barrel of the gun. (T.R. 1616-1617) Mr. Payne further testified that the striations in this gun had been corroded away and that it would not be possible to make a positive final match between this gun and any expended bullets. (T.R. 1618-1621) Further, Mr. Payne testified that the bullets from all three crime scenes did not match. (T.R. 1631-1637)
“At the evidentiary hearing, Hinton presented the testimony of three ballistics experts: Lannie G. Emanuel, Raymond E. Cooper, and John Dillon. (R. 61-150) All three experts testified that the projectiles recovered from John Davidson’s body were fired from the same weapon. (R. 70, 116, 141) All three experts testified that they were unable to determine whether or not all six projectiles recovered from the three crime scenes were fired from the same weapon; rather, their testing was inconclusive. (R. 100-101, 123, 147, 149)[2] Also, all three experts testified that they were unable to determine whether or not all six projectiles were fired from the weapon recovered from Hinton’s mother’s home; rather, that their results were inconclusive. (R. 77, 119, 143-147, 149) In other words, these expert witnesses could not exclude the possibility that Hinton’s gun fired those six projectiles. (R. 100)
“Hinton did not present evidence proving that the recovered projectiles were not fired from the gun recovered at his mother’s house. Rather, Hinton’s experts testified that while they could not make a conclusive match between the six projectiles and his weapon, they could not exclude the possibility that those projectiles were fired from that weapon. (R. 100) Therefore, this is not new evidence exonerating Hinton. At trial, Hinton presented expert testimony *274 that excluded the possibility that the six projectiles were fired from the weapon recovered from his mother’s . house. (T.R. 1637) As a result, this latest expert testimony is less persuasive of innocence than the expert testimony presented at trial.
“Because this expert testimony presented at the evidentiary hearing was offered for the same purpose as the expert testimony at Hinton’s trial, this expert testimony is cumulative to the evidence that was presented at trial. Also, because this expert testimony was less compelling of innocence than the expert testimony presented at trial, this evidence would not have changed the outcome of the verdict and it amounts merely to impeachment evidence. Accordingly, this claim is dismissed because it does not meet the requirements of newly discovered material facts under Rule 32.1(e) and because this evidence does not prove that Hinton is innocent of the crimes for which he was convicted.
“In addition, this allegation does not meet the requirement of Rule 32.1(e)(1) as newly discovered material facts because the evidence must have been incapable of discovery at the time of trial or at the time of filing post-trial motions. See Rule A.R.Cr.P. 32.1(e)(1)....
(C.R. 1521-25.) The record supports the circuit court’s findings, and we adopt them as part of our opinion.
At trial, Payne testified unequivocally that the Davidson, Vason, and Smother-man bullets were not fired from the revolver that was recovered from the appellant’s mother. Further, contrary to the appellant’s assertions in his brief and during oral argument to this court, the testimony of his Rule 32 experts was not as favorable to the defense. As set forth herein, Emanuel and Cooper carefully phrased their answers, discussed the limitations on their testing, and indicated that any conclusions they reached with respect to the Smother-man bullets and the revolver that was recovered from the appellant’s mother were based on the fact that they could not reproduce the same type of bullet. The circuit court, which observed the witnesses and, on several occasions, asked them very specific questions about their testing and conclusions, was in the best position to determine the credibility of the witnesses and their testimony. As its order indicates, the circuit court apparently concluded that their testimony was not sufficient to establish that any conclusion that the revolver that was recovered from the appellant’s mother did not fire the Smother-man bullets was not valid.
Rule 32.3, Ala. R.Crim. P., provides, in pertinent part:
“The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.”
Because the Rule 32 experts’ testimony was not as conclusive as Payne’s unequivocal trial testimony, the circuit court could have reasonably concluded that the appellant had not proved his claim by a' preponderance of the evidence; that Payne’s trial testimony was more compelling than .that of the Rule 32 experts; that the appellant *275 did not show that the outcome of his trial probably would have been different if the new evidence had been presented at trial; and that the new evidence did not establish that he is innocent of the crime for which he was convicted. See Johnson, supra; Rules 32.1(e) and 32.3, Ala. R.Crim. P.
Finally, during the evidentiary hearing, the circuit court stated:
“What if we come up with some different experts later on that are even more recognized as the ultimate experts? That’s what we’re getting into is a swearing contest between experts.
[[Image here]]
“... It concerns me that we’re going to get into a situation where somebody — one party feels that they have a better expert than was presented the last time, therefore the evidence is more believable. And that issue has already been addressed by a jury. This is a question of fact, not a question of law, and the question of facts are decided by the jury. I would be in essence second-guessing the jury and [its] determination based on the evidence that was presented to [it] on the same issues.”
(R. 10, 16.) We share the circuit court’s concerns, and we note that a party cannot go back after the trial to secure what he considers to be a more qualified expert. Allowing a party to do so would be contrary to the requirement of Rule 32.1(e)(2), Ala. R.Crim. P., that evidence not be merely cumulative to other facts that were known. Also, in such circumstances, proceedings might never end because, theoretically, better experts might always be found. The appellant had a chance to present expert testimony to the jury, and he did so. In fact, as we explain throughout this opinion, Payne’s testimony was much more favorable than that of the Rule 32 experts.
For the reasons set forth herein, the appellant has not shown that this new evidence satisfies the requirements of Rule 32.1(e), Ala. R.Crim. P. Therefore, he is not entitled to relief on this claim.
B.
The appellant also contends that new evidence shows that he did not plan or commit the murders.
1.
The appellant asserts that “the new evidence makes it clear that no reasonable basis exists for believing that Mr. Hinton could leave his place of work sometime after 12:10 a.m., travel fifteen miles and expect that restaurant employees at the Quincy’s would still be there when he arrived.” (Appellant’s brief at p. 25.) He bases his argument on the fact that La-Tonya Herron and Robert Stephenson testified during the evidentiary hearing that the time Quincy’s employees locked the restaurant and left varied from night to night.
' In its order on the petition, the circuit court found as follows:
“Hinton alleges that newly discovered material facts prove that he was at work in a secure warehouse -facility at the time of the Quincy’s robbery, which is the crime that tied him to the Davidson/Vason murders. This alleged ‘new evidence’ is not newly discovered evidence under Alabama Rule of Criminal Procedure 32.1(e) because it was presented at the trial in 1986. Thus, this alleged ‘new evidence’ is cumulative to the evidence that was presented at trial and it obviously did not change the outcome of the trial.
“At trial, Hinton presented the testimony of Larry Lochrico, the shift supervisor at the Bruno’s warehouse where Hinton was working. (T.R. 1337-1385) *276 Mr. Lochrico kept employment records and he testified that the records showed that Hinton arrived at work at 11:57 p.m. on July 25, 1985, that Hinton worked until 6 a.m., that part of the warehouse was fenced in, that there were alarms on the doors, and that the alarms did not always work. (T.R. 1338-1374) Hinton presented the testimony of Tom Dahl, the supervisor of temporary employees at the Bruno’s warehouse and his supervisor on the night of the Smotherman robbery. (T.R. 1386-1415) Mr. Dahl testified that he saw Hinton three times during the first two hours of his work shift on July 25, 1985, but that he did not see Hinton every thirty minutes. (T.R. 1387-1407) Hinton presented the testimony of Lloyd Warnken, the head of security for the Bruno’s warehouse. (T.R. 1416-1453) Mr. Warnken testified that all the gates to the warehouse were guarded, that there were records of people entering and exiting the warehouse,- and that the doors sounded loudly when opened. (T.R. 1422-1442) In addition, Hinton testified that he was at work in the Bruno’s warehouse at the time of the Smother-man robbery. (T.R. 1458-1475)
“At the evidentiary hearing, Hinton’s counsel conceded that his trial counsel put on ‘a very, very powerful alibi.’ (R. 56) Because the evidence Hinton alleges as new was presented at the trial, this evidence was not permitted at the evi-dentiary hearing. Accordingly, this claim is dismissed because it does not meet the requirements of newly discovered material facts under Rule 32.1(e).
“In addition, this allegation does not meet the requirement of Rule 32.1(e)(1) as newly discovered material facts because the evidence must have been incapable of discovery at the time of trial or at the time of filing post-trial motions. See A.R.Cr. P. 32.1(e)(1).”
(C.R. 1525-28.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. We also note that, at trial, the appellant presented extensive alibi evidence and evidence about how difficult it would have been for him to be at work and to get to Smotherman’s location in a short span of time. Therefore, such evidence would have been cumulative to that presented at trial and would have constituted impeachment evidence. See Rule 32.1(e)(2) and (3), Ala. R.Crim. P. We further note that the appellant did not show that the outcome of his trial probably would have been different if the new evidence had been presented at trial and that the new evidence did not establish that he is innocent of the crime for which he was convicted. See Rule 32.1(e)(4) and (5), Ala. R.Crim. P. Therefore, he has not satisfied his burden of pleading and proof pursuant to Rules 32.1(e), 32.3, and 32.6(b), Ala. R.Crim. P., as to this claim. Accordingly, he is not entitled to relief in this regard.
2.
The appellant also asserts that Smotherman’s identification was not reliable.
a.
First, the appellant alleges that Smoth-erman initially mistook Leon Perry as the perpetrator, mistook Perry’s Mercedes automobile for a Porsche automobile, and referred to the perpetrators as “they.” In its order denying the petition, the circuit court found as follows:
“Hinton alleges that newly discovered material facts prove that Mr. Smother-man’s identification of the assailant and the assailant’s car was unreliable 'because Mr. Smotherman initially mistook Leon Perry as the assailant immediately after the robbery. Hinton failed to meet his burden of proving this allega *277 tion under Alabama Rule of Criminal Procedure 32.3 because Hinton never presented evidence of Mr. Smotherman mistaking Leon Perry as the robber. Rather, Hinton only offered evidence showing that Mr. Smotherman described Leon Perry’s car as ‘look[ing] like a late model Porsche or a very nice car’ when it was actually a Mercedes. (R. 198; Petitioner’s Exhibit 20) Therefore, the evidence offered at the evidentiary hearing would not qualify as newly discovered evidence under Rule 32.1(e) because, at best, this would only be impeachment evidence.. This description of the car in which Mr. Smotherman rode to the hospital after being robbed and shot in the head would not have changed the outcome of the trial and it does not establish that Hinton is innocent of the crimes for which he was convicted. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000)(Petitioner who presented no evidence in support of claim did not meet his burden of pleading and proving by a preponderance of the evidence facts that would entitle him to relief under Rule 32.3.).
“At trial, Mr. Smotherman testified that he left the Quincy’s after the shooting and that he ran to the Motel 6 across the parking lot. While doing this, he saw a car and it scared him:
“ ‘Mr. McGregor: What, if anything, did you do when you left the store after being shot?
“ ‘Mr. Smotherman: I went across the parking lot going over to Motel 6 as I was—
“ ‘Mr. McGregor: Did you get there?
“ ‘Mr. Smotherman: Yes, sir; as I was going across the lot a car pulled in like he was going up toward Motel 6 and I thought; My Goodness! That may be him, he’s watching or something, so I ran down toward that little Waffle House and they called—
“ ‘Mr. McGregor: Did you get there? “ ‘Mr. Smotherman: Sir?
“ ‘Mr. McGregor: Did you get there? “ ‘Mr. Smotherman: Almost.
“ ‘Mr. McGregor: What happened then?
“‘Mr. Smotherman: The car had already gone up and parked at Motel 6 and they were apparently opening their trunk like guests so I went on up to the motel. I walked in the lobby and told the manager I’ve been shot and robbed and I need help, please, call the police. And he said, come on in the office. So I went in the officer [sic], the manager was there and his night security man, I think, was the other man, he came in there. And he called the' Bessemer police and I asked him to dial my district leader’s number so I could tell him what happened. He dialed the district leader and I talked to the district leader and told him I’d been robbed and shot. He told me to stay with the emergency people and not to worry about the store he was going to the store. The car that had pulled in was driven by Leon Perry, professional football player.
“ ‘Mr. McGregor: Did you know him at that time, Mr. Smotherman?
“‘Mr. Smotherman: No, sir; that’s when I met him.’
“(T.R. 889-890) Accordingly, the record clearly ghows that Mr. Smotherman did not mistakenly identify Leon Perry as the robber or his car as the robber’s car. Therefore, this claim is dismissed because Hinton failed to meet his burden of proving this allegation and the evidence that he did offer fails to state a claim of newly discovered material facts.”
*278 (C.R. 1530-33.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief in this regard.
b.
Second, the appellant alleges that new evidence shows that he did not own a vehicle that matched the description Smotherman gave for the perpetrator’s vehicle. Specifically, he proffered documents that showed that his green Chevrolet vehicle had been repossessed before the Smotherman offense occurred. However, at trial, he presented evidence that the green Chevrolet had been repossessed and that he was driving a red Nissan vehicle. Therefore, the alleged new evidence was simply cumulative to evidence the defense presented at trial. See Rule 32.1(e)(2), Ala. R.Crim. P. Accordingly, he is not entitled to relief pursuant to Rule 32.1(e), Ala. R.Crim. P., on this claim.
c.
Third, the appellant alleges that new evidence shows that Robert Stephenson was in the Food World with Clark Hayes; that he did not see a strange person in the store; that he was pressured by a Bessemer law enforcement officer to identify the appellant; and that he was ostracized by Quincy’s employees because he would not identify the appellant. In its order on the petition, the circuit court found as follows:
“At the evidentiary hearing, Hinton presented the testimony of former Quincy’s employees Robert Stephenson and Latonya Herron. Both Stephenson and Herron testified that they were at Food World on the night of the Smotherman robbery and that they did not see Hinton there; however, they testified that he did not see anyone strange there that night. (R. 151-152, 168) In addition, Herron also testified that she did not see Mr. Smotherman there, even though it was well established that Mr. Smoth-erman was there that night. (R. 172) This testimony does little to discredit the testimony of Clark Hayes because they did not testify that they saw the same suspicious person that Clark Hayes saw, but that it was not Hinton; rather, their testimony was that they did not see anyone suspicious at the Food World that night and that they did not see Hinton. Thus, presentation of this evidence would have had little effect on the verdict....”
(C.R. 1560.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Also, the evidence presented at the trial showed that Stephenson went to the Food World when Smotherman and Hayes did. Therefore, the appellant has not shown that
“[t]he facts relied upon were not known by the petitioner or the petitioner’s counsel at the time of trial or sentencing or in time to file a posttrial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence.”
Rule 32.1(e)(1), Ala. R.Crim. P. Further, the evidence would have constituted impeachment evidence at most. See Rule 32.1(e)(3), Ala. R.Crim. P. Finally, the appellant did not show that the outcome of his trial probably would have been different if the new evidence had been presented at trial and that the new evidence did not establish that he is innocent of the crime for which he was convicted. See Rule 32.1(e)(4) and (5), Ala. R.Crim. P. Accordingly, he is not entitled to relief on this claim.
3.
Finally, the appellant asserts that crimes with the same modus operandi con *279 tinued in the Birmingham area after he was arrested. In its order on the petition, the circuit court found as follows:
“Hinton alleges that newly discovered material facts prove that the actual perpetrator of the Davidsori/Vason murders was continuing to commit similar crimes after he was arrested. This allegation does not qualify as newly discovered material facts under Alabama Rule of Criminal Procedure 32.1(e) because this evidence was presented at trial and, thus, it would not have changed the outcome of the trial.
“At trial, Hinton presented the testimony of Birmingham Police Investigator James Chambliss, who testified that crimes similar to the Davidson and Va-son murders occurred after Hinton was arrested and that no one had been apprehended for those crimes. (T.R. 1811-1320) Any additional testimony of facts that were already presented to the jury is cumulative, it obviously did not change the outcome of the verdict, and it does not prove that Hinton is innocent of the crimes for which he was convicted. Thus, this claim is dismissed because it does not qualify as a new discovered material fact under Rule 32.1(e).”
(C.R. 1534.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief in this regard.
II.
The appellant’s second argument is that the State did not disclose exculpatory and impeachment evidence. A criminal defendant is entitled to discover documents and tangible things “(1) [w]hich are material to the preparation of defendant’s defense; ... (2) [w]hich are intended for use by the state/municipality as evidence at the trial; or (3) [w]hich were obtained from or belong to the defendant.” Rule 16.1(c), Ala. R.Crim. P. “To prove a Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),] violation, a defendant must show that ‘ “(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial.” ’ ” Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998) (quoting Johnson v. State, 612 So.2d 1288, 1293 (Ala.Crim.App.1992)). In the Brady context, “evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
A.
The appellant contends that the State improperly withheld Department of Forensic Sciences (“DFS”) reports. Specifically, he asserts that the reports “dispute the contention at trial that there was ‘ample evidence’ of a match; expose the fact that the experts changed their conclusions after re-examining the évidenee; reveal that every test bullet fired from the Beulah Hinton weapon bears prominent, distinct class characteristics that were not present on the recovered bullets; [and] reveal that Yates and Higgins only assigned class characteristics to the recovered bullets after identifying the class characteristics of the Beulah Hinton weapon.” (Appellant’s brief at pp. 35-36.)
In its order on the petition, the circuit court found as follows:
“Hinton alleges that the State withheld certain ballistics worksheets containing question marks where the lands and grooves measurements of the recovered bullets should have been indicated. (Petitioner’s Exhibit 19) This claim is dismissed for failure to allege or prove the *280 facts necessary to entitle Hinton to relief in accordance with Alabama Rule of Criminal Procedure 32.8. The State’s ballistics experts being unable to record land and groove measurements from the recovered bullets is not exculpatory evidence because they testified that their ability to determine that there was a match was based upon the microscopic markings left on the unmutilated bearing surfaces of the bullets. (T.R. 1214-1234, 1275-1290) The State’s ballistics experts’ inability to make land and groove measurements on the recovered bullets has no bearing on their abilities as experts because none of the Petitioner’s experts were able to make land and groove measurements, either. Furthermore, the testimony of the State’s experts, taken by deposition, demonstrates that these questions marks were not material or impeachment material. Thus, this claim is dismissed because Hinton has not proved that the State withheld exculpatory evidence from him at trial.”
(C.R. 1629-30.) The record supports the circuit court’s findings, and we adopt thém as part of this opinion.
The depositions of Higgins and Yates reveal that they determined that the Davidson, Vason, and Smotherman bullets had been fired from the same gun before they received the revolver that was recovered from the appellant’s mother; that they determined that the Davidson, Vason, and Smotherman bullets had been fired from the same gun and that they had been fired from the revolver that was recovered from the appellant’s mother based on microscopic striations and not based on class characteristics; that they used worksheets to make notes as they conducted their examinations and then prepared a final report; that they used some question marks and dashes because many of the class characteristics for the bullets were not readily discernible or could not be measured accurately and meaningfully; that they could determine some general class characteristics such as caliber and that the gun from which they had been fired had a timing problem; and that they noted on the worksheets that they had found matches to the revolver that was recovered from the appellant’s mother. Also, although Higgins could not initially determine that the Davidson bullets had been fired from the same gun, he explained that that was because he did not have anything with which to compare them and that an exclusion at that point would be premature. Moreover, all of the Rule 32 experts determined that the Davidson bullets had been fired from the same gun. Further, Yates testified that, because his microscopic examination of each bullet was extensive, he did riot make specific notes about the striations on the worksheets. Instead, he noted on the worksheets that the bullets had been fired from the same barrel.
The information on the worksheets supports, rather than disputes, Higgins’ and Yates’ testimony that there was ample evidence that the Davidson, Vason, and Smotherman bullets had been fired from the same gun and that they had been fired from the revolver that was recovered from the appellant’s mother; it does not support the appellant’s bare allegation that Higgins and Yates changed their conclusions and assigned class characteristics after examining the revolver that was recovered from the appellant’s mother; and it refutes the assertion that Higgins and Yates did not find any matching class characteristics on the Davidson, Vason, and Smotherman bullets before they received the revolver that was recovered from the appellant’s mother. Also, at trial, the defense thoroughly cross-examined Higgins and Yates and presented extensive testimony from *281 Payne to refute Higgins’ and Yates’ testimony and conclusions. For these reasons, the appellant has not established that the worksheets were favorable to the defense and that they would have been material, or that the outcome of the trial probably would have been different if they had been disclosed to the defense. Therefore, he is not entitled to relief on this claim.
B.
The appellant also contends that the State improperly withheld witness statements from the defense.
1.
The appellant asserts that the State improperly withheld a statement by Robert Stephenson. Stephenson’s statement is discussed in more detail in Parts I. and III. of this opinion. In its order on the petition, the circuit court found as follows:
“Hinton alleges that the State violated his rights under Brady v. Maryland withheld evidence and statements that undermined the State’s assertion that Hinton was in the Food World prior to the Quincy’s robbery. Specifically, Hinton alleges that statements from employees of Quincy’s ... were withheld. At the evidentiary hearing, ... Hinton presented the testimony of Robert Stephenson, who testified that he did speak with police; that he told police he did not see anyone suspicious at Food World the night of the Quincy’s robbery; and, that he did not see Hinton there. (R. 152-158) ... Stephenson [did not testify] that [he] saw the same suspicious person that Clark Hayes saw, but that it was not Hinton. Rather, [he] testified that [he] did not see anyone that looked suspicious. Therefore, this is not exculpatory evidence because it does not prove that Hinton is innocent and it is not impeachment evidence because [this] non-witness[ ] to the crime had no helpful information about the crime. Accordingly, this claim is dismissed in accordance with Alabama Rule of Criminal Procedure 32.3 for failure to prove the facts necessary to entitle him to relief.”
(C.R. 1634-36.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. The appellant has made bare allegations, but he has not supported them with facts and evidence. Therefore, he has not satisfied his burden of pleading and proof pursuant to Rules 32.6(b) and 32.3, Ala. R.Crim. P., and Brady. Accordingly, he is not entitled to relief on this claim.
2.
The appellant also asserts that the State improperly withheld a statement by Leon Perry. Perry’s statement is discussed in more detail in Parts I. and III. of this opinion. However, he did not raise this specific Brady claim in any of his petitions or during the evidentiary hearing. Rather, he raised it for the first time in his post-hearing brief. Therefore, we question whether it is properly before this court. See Morrison v. State, 551 So.2d 435 (Ala.Crim.App.1989).
Moreover, as set forth in Part I.B.2.a. of this opinion, much of the information was actually presented at trial. Thus, trial counsel definitely knew about Perry’s involvement in the case at that time and could have questioned him about it. Further, the appellant has not established that the statement was exculpatory and material, or that the outcome of the trial probably would have been different if the evidence had been presented. Rather, he simply made bare allegations that he did not support with facts and evidence. Therefore, the appellant has not established his burden of pleading and proof pursuant to Rules 32.6(b) and 32.3, Ala. *282 R.Crim. P., and Brady. Accordingly, he is not entitled to relief on this claim.
III.
The appellant’s third argument is that his counsel rendered ineffective assistance at trial and on direct appeal.
A.
First, the appellant contends that his trial counsel rendered ineffective assistance due to allegedly inadequate compensation. To the extent he challenges the statutory limit on attorney fees in capital cases, his argument is procedurally barred because he could have raised it at trial and on appeal, but did not. See Rule 32.2(a)(3) and (5), Ala. R.Crim. P. To the extent he raises an ineffective-assistance-of-counsel claim, he makes only the following bare allegations and conclusions:
“Sheldon Perhacs was appointed to represent Mr. Hinton at trial. (R. 74.) Alabama law permits the appointment of two lawyers in capital cases but the trial court did not appoint another lawyer to assist Mr. Perhacs. Instead, over counsel’s repeated objection, the trial court took the unprecedented step of sua sponte consolidating two separate capital murder cases into a single trial. See Ex parte Hinton, 548 So.2d 562, 566 (Ala.1989) (‘this is the first consolidation of capital cases in Alabama.’). To prove the two capital murder charges, the State relied on evidence of a third crime: the uncharged Quincy’s robbery. Consequently, counsel had to defend against three separate cases.
“Alabama Code section 15-12-21 provided, at the time of Mr. Hinton’s trial that a court-appointed attorney trying a capital case could be compensated no more than $1000 for out-of-court work. Mr. Perhacs was appointed to defend— in a single trial — two separate capital murder cases and a robbery case, but his compensation remained capped at $1000. Counsel received only $1000 for his out-of-court work for the entire three-in-one trial (PR. 180), even though appointed Alabama attorneys typically received up to $1000 for each phase of a capital trial. See Ingram v. State, 779 So.2d 1225, 1279 (Ala.Crim.App.1999) (‘portion of the Alabama statute, § 15-12-21 (d), limiting court-appointed attorneys’ fees to $1,000 for out-of-court work for each phase of a capital trial is [not] unconstitutional’) (emphasis added).
“Counsel explained at the Rule 32 hearing that Mr. Hinton’s defense ‘require[d] a lot of timé and effort’ because ‘[t]wo capital cases were combined for trial, but they were all contingent upon the occurrence of a third event which was a robbery at Quincy’s.’ (PR. 180.) Nonetheless, counsel’s ‘fee declaration was rejected’ because ‘there was no provision for payment of two cases even though they had been combined.’ (PR. 180.) In addition to this extraordinary limitation, counsel was promised only $500 per case to obtain the assistance of an expert toolmark examiner (R. 2118) even though the statute authorized more funds — assistance which was indispensable to prove Mr. Hinton’s innocence.
“Counsel made clear both at trial and in his Rule 32 testimony that the court-allotted funds were insufficient to provide effective assistance. (R. 42, 74, 64-70; PR. 181, 188, 207.) Not only did Alabama law place unconstitutional restrictions on compensation and resources for Mr. Hinton’s defense, but Mr. Hinton was deprived even of the resources to which he was entitled under that law.”
(Appellant’s brief at pp. 64-66) (footnote omitted).
*283 During the evidentiary hearing, the defense called Sheldon Perhacs, who represented the appellant at trial and on direct appeal. He testified that, when he represented the appellant, 80 percent of his practice was criminal defense work; that he was paid $1,600 for representing the appellant; that that was not adequate compensation because he spent much more time than that trying the case; that the ease required a lot of effort because he was, in effect, defending three cases at one time; and that he tried to get compensated for the two capital cases, but his fee declaration was rejected. On cross-examination, Perhacs admitted that he worked more hours than those for which he was paid in the case.
In its order on the petition, the circuit court found as follows:
“Sheldon Perhacs testified that the amount of money he was paid did not compromise the amount of time he spent in his representation of Hinton. (R. 179, 205) Mr. Perhacs testified extensively as to his investigation and preparation for this case. (R. 181-187) Lack of compensation, per se, is not proof of ineffective assistance of counsel. See, e.g., Ex parte Smith, 698 So.2d 219 (Ala.1997); Ex parte Grayson, 479 So.2d 76 (Ala.1985); Taylor v. State, 808 So.2d 1148, 1204-1205 (Ala.Crim.App.2000); Griffin v. State, 790 So.2d 267, 347 (Ala.Crim.App.1999); Bryant v. State, CR-98-0023, 951 So.2d 702 (Ala.Crim.App.Nov.19, 1999); Bui v. State, 717 So.2d 6 (Ala.Crim.App.1998); Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997); See also Foster v. Kassulke, 898 F.2d 1144 (6th Cir.1990) (‘The relationship between her attorney’s compensation and his effectiveness as counsel is by no means certain. Were it so, pro bono defense counsel would be by definition “ineffective.” This conclusion, of course, flies in the face of reality when it is observed that many pro bono cases are handled with a great deal of competence.’).”
(C.R. 1540-41.) We agree with the circuit court’s findings, and we adopt them as part of this opinion. The appellant made conclusory statements about counsel’s performance being impeded, but he did not support his assertions with facts and/or evidence. Therefore, he did not satisfy his burden of pleading and proof as to this claim. See Rules 32.3 and 32.6(b), Ala. R.Crim. P. Accordingly, he is not entitled to relief in this regard.[9]
B.
Second, the appellant contends that counsel did not present a competent toolmark examiner. During the evidentia-ry hearing, Perhacs testified that firearm and toolmark examination was critical to the case because the three crimes could not be connected without it; that he attempted to locate an expert; and that locating an expert was not easy because the experts he contacted who were qualified would not take the case due to the statutory limit on compensation and because he could not find anyone local who he considered to be qualified. He also testified that he contacted firearms experts he knew and asked for their recommendations regarding an expert; that he contacted people both locally and nationally, including people in New York, Virginia, Boston, Maryland, New Orleans, and Miami; and that some of the people he contacted were not qualified and some would not take the case *284 because of the limit on compensation. Ultimately, Perhacs hired Andrew Payne as an expert for the defense. He testified that he was happy with Payne and that Payne went out of his way to be helpful to him and to the appellant. However, he also testified that Payne did not have the expertise he thought he needed and that he did not consider Payne’s testimony to be effective. On cross-examination, Per-hacs stated that he did everything he knew to do to get a qualified firearms expert for the trial; that the experts he considered to be qualified would not work for the amount of money he could pay them; and that Payne brought him reference materials while he was helping with the case.[10]
In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to obtain and present qualified ballistics experts who could have proved that the bullets recovered from the crime scenes were not fired from the gun recovered in his mother’s home....
[[Image here]]
“... Hinton alleges that his trial counsel was deficient for not presenting [any] evidence that, the bullets found at the crime scenes were not fired from the gun found at his mother’s house; however, Hinton’s counsel did put on such testimony. Hinton’s counsel presented the testimony of Andrew H. Payne, Jr., a consulting engineer who studied firearms and projectiles. (T.R. 1571-1667) Mr. Payne has been qualified as an expert ballistics witness for several criminal and civil cases in Alabama. Mr. Payne testified that the type of bullets fired from the gun recovered at Hinton’s mother’s house used a corrosive primer that eventually corroded the toolmark-ings inside the barrel of the gun. (T.R. 1616-1617) Mr. Payne further testified that the toolmarkings in this gun had been corroded away and that it would not be possible to make a positive final match between this gun and any expended bullets. (T.R. 1618-1621) In addition, Mr. Payne testified that the bullets from the three crime scenes did not match. (T.R. 1631-1637) Accordingly, the trial record clearly refutes Hinton’s claim that his trial counsel was ineffective for failure to present testimony in rebuttal to the State’s ballistics evidence. For these same reasons, this claim is also dismissed under Alabama Rule of Criminal Procedure 32.3 for failure to meet his burden of proving' the facts necessary to warrant relief.”
(C.R. 1545-48.)
“Hinton alleges that his trial counsel was ineffective for failing to file a motion for continuance when he realized his ballistics expert was not qualified to testify and for failing to seek additional funds to hire a better expert witness....
[[Image here]]
“... Hinton alleges ... that a qualified ballistics expert would have testified that the bullets fired at the three crime scenes were not fired by the gun recovered at his mother’s house; however, this is exactly what his ballistics expert testified at trial. (T.R. 1571-1668) Thus, Hinton fails to meet his burden of pleading or proving that his counsel was deficient or how he was prejudiced when the expert chosen by trial counsel testified *285 to what he claims any other ‘qualified’ ballistics expert would have testified.... For these same reasons, this claim is also dismissed under Rule 32.3 for failure to meet his burden of proving the facts necessary to warrant relief.”
(C.R. 1548-50.) The record supports the circuit court’s findings, and we adopt them as part of this opinion.
In his brief to this court, the appellant asserts:
“Counsel complained to the trial court about not having enough money to hire a qualified expert, but when the court failed to approve additional funds despite its promise to look into it (R. 10), counsel did not assert that he was entitled to sufficient funds to hire a competent expert pursuant to Ake v. Oklahoma, 470 U.S. 68 (1985), nor did counsel correct the court’s erroneous belief that the statute limited funds for experts to $500.[39]
(Appellant’s brief at p. 73.) Judge Cobb would reverse on the ground that trial counsel rendered ineffective assistance because he did not “recognize that the Jaw regarding compensation had changed[ and] proceeded to trial believing he was ‘stuck’ with an unqualified witness.” 172 So.3d at 319. For the reasons set forth herein, we disagree and find that the appellant’s arguments are not properly before this court and are also without merit.
Initially, we note that, although the appellant briefly referenced § 15 — 12—21(d), Ala.Code 1975, in footnotes in pleadings before the circuit court, he never specifically argued that counsel rendered ineffective assistance because he did not know that the statute had been amended to remove the cap and because he did not correct the trial court’s erroneous belief that the statute limited funds for an expert to $500. In fact, in his final amended petition, the appellant asserted:
“Petitioner was additionally denied effective assistance of counsel at trial by defense counsel’s failure to motion for a continuance when he learned at trial that his gun expert was not qualified to testify about the ballistics evidence presented by the state in this case. Counsel was additionally ineffective to not seek additional funds when it became obvious that the individual willing to examine the evidence in the case for the $1,000 allotted by the court was incompetent and unqualified. Indeed, this failure to seek additional, sufficient funds is rendered all the more inexplicable by the trial court’s express invitation to counsel to seek more funds if such funds were necessary. (R. 10-12.)”
(C.R. 419.) Although the appellant presented evidence about the insufficiency of the funding during the evidentiary hearing, he never questioned trial counsel about whether or not he knew that the cap had been removed.[11]
*286 Also, with regard to the cap on fees for experts, the appellant appears to be taking an inconsistent position on appeal from the one he took in the circuit court. In his post-hearing brief, he argued:
“Mr. Perhacs made clear to this Court that he could not effectively confront the state’s evidence without a qualified tool-marks expert. Mr. Perhacs acknowledged and understood that a competent toolmarks expert would be ‘a pivotal witness.’ (R. 55.) Mr. Perhacs explained to the Court that ‘the problems are worse trying to go to trial without an expert, because no matter what anybody says about anything, this case would not get off the ground if there wasn’t a ballistics comparison.’ (R. 63.) Mr. Perhacs’s extensive efforts to retain a qualified expert were frustrated by the limited funds made available to him. Without competent, qualified expert assistance, trial counsel could not effectively confront the state’s case and establish Mr. Hinton’s innocence. The money made available to Mr. Perhacs did not permit him to obtain the expert assistance he needed to provide effective assistance to Mr. Hinton as required by state and federal law.[21]
“Mr. Hinton’s trial counsel filed an extensive motion requesting adequate compensation for his representation but was allocated only $500 per case for a ■ toolmarks expert. (R. 1997, 2115.) Mr. Perhacs explained in a pretrial hearing that his client’s rights to a fair trial were being jeopardized by the lack of funds for expert assistance. Mr. Perhacs told this Court:
‘“I’m not going to be able to bring two separate experts up here. I can only hire one and I’m limited by the amount of money I can spend on him and I can present to the Court I haven’t found him or her yet, but I’m stuck with only one expert in the case. I cannot bolster that opinion by the opinion of a third or fourth or fifth expert in the case which creates the unreasonable burden on the defendant to attempt to prove his innocence....
“(R. 42.) Mr. Perhacs’s frustration with being unable to retain a qualified expert was made plain to this Court at a pretrial motions hearing, where Mr. Per-hacs stated:
“‘And I’ve also spent enough time that I exceeded the allowance limit just in the time I’ve been looking for a doggone expert. Now, I know just about everybody in the Southeast region up to Virginia who can testify about ballistics and I can tell you just about everybody who’s retired, but I can’t present somebody to the Court who is going to say they’re going to do it for my client. Payne is the only shot I’ve got so far.’
“(R. 62-63.) At that pretrial hearing, counsel further articulated his reluctance to hire the only' ‘expert’ willing to testify for the money that was available, Andrew Payne:
“T made an effort to get somebody that I thought would be useable. And I’ll have to tell you what I did abut [sic] Pat Payne. I called a couple of other lawyers in town who did that to ask if they knew of anybody. One of them knew him; one of them knew him. The reason I didn’t contact him was because he wasn’t recommended by the lawyer. So now I’m stuck that he’s the only guy I could possibly produce.’
“(R. 70-71.) Trial counsel repeatedly told this Court that he could not find a qualified independent expert to examine *287 the recovered projectiles and the gun who would, accept only the $500 fee allotted to the defense. (R. 10-11, 54-55, 62-67, 69-70, 2115-17, 2118.) Trial counsel unsuccessfully sought additional funds to hire a qualified expert.[22] (R. 10-12.) Mr. Perhacs contacted over a dozen experts locally and across the country but found no qualified expert willing to travel to Alabama and work on the case for the funds that he had available. (R. 64-70.) (See Issue VII, infra, incorporated by reference.)
(C.R. 1244-46) (emphasis added).
In Issue VII of his post-hearing brief, which he incorporated into his argument about trial counsel’s performance with regard to a ballistics expert, the appellant argued that “[t]he failure to provide the defense with adequate expert assistance violated [his] rights under Ake v. Oklahoma, and state and federal law.” (C.R. 1277.) In support of his claim, the appellant contended, in relevant part:
“Mr. Hinton’s defense at trial was severely constrained by a lack of resources. ... Despite the fact that the entire case against Mr. Hinton turned on crucial firearms evidence, this Court made available to Mr. Hinton only $500 per ease for hiring a defense expert. (R. 2118.)[29] ...
[[Image here]]
“As a result of this Court’s failure to appropriate sufficient funds, trial counsel was unable to hire a qualified and appropriate expert ....
[[Image here]]
“The trial court’s failure to provide funds for a qualified expert(s) violated Mr. Hinton’s right to present a defense, ... and his right under Ake to competent* state-funded expert testimony....
(C.R. 1278-85) (emphasis added).
Clearly, the focus of the appellant’s claim in his post-hearing brief was that the *288 blame for the limit on funding for an expert was on the trial court rather than on trial counsel. As he argued, trial counsel repeatedly informed the trial court that the funding for an expert was not sufficient, and trial counsel made it clear to the trial court that he needed more funds. However, he concluded that trial counsel’s hands were tied because the trial court simply did not provide for any additional funds for an expert.
To the extent the appellant may intend for this to be a separate ineffective-assistance claim, it is not properly before this court because he did not first present it to the circuit court. See Morrison v. State, 551 So.2d 435 (Ala.Crim.App.1989). To the extent he may intend for it to support his claim that trial counsel rendered ineffective assistance because he allegedly did not present a competent ballistics expert, it is not properly before this court because it is not consistent with the arguments he presented to the circuit court. See Davis v. State, 720 So.2d 1006, 1029-30 (Ala.Crim.App.1998) (noting that a party may not assume inconsistent positions before the circuit court and on appeal).
Moreover, even if the appellant’s argument were properly before this court, it is without merit. We have reviewed Payne’s trial testimony, and we note that he testified in detail about his extensive experience with firearms and toolmarks; the identification of striations and lands and grooves; how rifling is created; how bullets travel when shot; his extensive use of comparison microscopes; various ways toolmarks can be obscured or obliterated, including by corrosive primers; his examination of the bullets and revolver in this case; and his conclusion that the bullets had not been fired from the revolver that was recovered from the appellant’s mother.[12] We also note.that defense counsel thoroughly and extensively cross-examined the State’s firearm and toolmark experts and that Payne apparently prepared him for that cross-examination. We further note that, even though Payne did not test-fire the revolver, he examined the bullets the State’s experts test-fired. Therefore, unlike the appellant’s Rule 32 experts, Payne examined the same test bullets the *289 State’s experts examined. Finally, we note that Payne’s testimony was more favorable to the defense than that of the appellant’s Rule 32 experts because he testified unequivocally that the Davidson, Va-son, and Smotherman bullets had not been fired from the revolver that was recovered from the appellant’s mother.[13] Thus, even assuming that counsel’s apparent ignorance that the cap on expert expenses had been lifted constituted deficient performance, for the reasons set forth herein, the appellant has not shown that he was prejudiced by that deficient performance. See Strickland, supra.
For these reasons, we conclude that the appellant has not satisfied his burden of pleading and proof under Rules 32.8 and 32.6(b), Ala. R.Crim. P., and Strickland, supra, and that, therefore, he is not entitled to relief on this claim.
C.
Third, the appellant contends that counsel did not investigate and present evidence that would have established his innocence.
1.
The appellant asserts that counsel did not discover and present evidence that undermined the State’s time line for the Quincy’s robbery. Specifically, he alleges that counsel should have presented the testimony of Robert Stephenson and La-Tonya Herron about the varying times at which émployees left Quincy’s. However, he did not raise this specific ineffective-assistance-of-counsel claim in any of his petitions or during the evidentiary hearing. Rather, he raises it for the first time on appeal. Therefore, it is not properly before this court. See Morrison v. State, 551 So.2d 435 (Ala.Crim.App.1989).
Moreover, for the reasons set forth in Part I.B.l. of this, opinion, the appellant has not shown that the presentation of such evidence would probably have changed the outcome of his trial. Although he has made bare allegations, he has not supported them with facts and evidence to show that counsel rendered ineffective assistance in this regard. Therefore, he has not satisfied his burden of pleading and proof pursuant to Rules 32.6(b)' and 32.3, Ala. R.Crim. P., and Strickland. Accordingly, he is not entitled to relief on this claim.
2.
The appellant also asserts that counsel did not establish that Clark Hayes misidentified him and that law enforcement officers coerced a witness. Specifically, he alleges that Stephenson and Her-ron would have testified that they were in the Food World with Hayes and did not see the appellant. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to adequately investigate whether other Quincy’s employees at Food World with Mr. Smoth-erman and Clark Hayes on the night of the robbery could have established that the robber was not Hinton and that Hayes’s identification of Hinton was not credible....
[[Image here]]
“... At the evidentiary hearing, Hinton presented the testimony of former Quincy’s employees Robert Stephenson and Latonya Herron. Both Stephenson and Herron testified that they were at Food World on the night of the Smoth-erman robbery and that they did not see Hinton there; however, they testified that he did not see anyone strange there *290 that night. (R. 151-152, 168) In addition, Herron also testified that she did not see Mr. Smotherman there, even though it was well-established that Mr. Smotherman was there that night. (R. 172) This testimony does little to discredit the testimony of Clark Hayes because they did not testify that they saw the same suspicious person that Clark Hayes saw, but that it was not Hinton; rather, their testimony was that they did not see anyone suspicious at the Food World that night and that they did not see Hinton. Thus, presentation of this evidence would have had little effect on the verdict and Hinton’s trial counsel was not ineffective for not presenting this evidence....
“... Hinton also failed to present evidence about whether or not his trial counsel did investigate these additional witnesses and, rather, made a strategic decision not to present their testimony. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’). Trial counsel was not questioned about this choice and thus the record is silent; thus, this Court cannot presume error from a silent record and must presume that counsel acted reasonably. Accordingly, this claim is dismissed because Hinton did not meet his burden of proof. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner failed to meet burden of proving the facts that would entitle him to relief under Rule 32.3 because petitioner presented no evidence in support of his claim.).”
(C.R. 1558-61.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
The appellant also alleges that counsel rendered ineffective assistance because he did not introduce evidence that Herron thought that.Hayes was “slow”; that officers tried to coerce Stephenson to say that he saw the appellant at Food World; and that Quincy’s personnel ostracized Stephenson because he did not identify the appellant. (Appellant’s brief at p. 80.) However, he did not raise this specific ineffective-assistance-of-counsel claim in any of his petitions or during the eviden-tiary hearing. Rather, he raised it for the first time in his post-hearing brief. Therefore, we question whether it is properly before this court. See Morrison v. State, 551 So.2d 435 (Ala.Crim.App.1989).
Moreover, the appellant has not shown that not presenting such evidence constituted deficient performance and that such allegedly deficient performance prejudiced him. Rather, he has simply made bare allegations that he has not supported with facts or evidence. Therefore, he has not satisfied his burden of pleading and proof under Rules 32.6(b) and 32.3, Ala. R.Crim. P., and Strickland. Accordingly, he is not entitled to relief in this regard.
3.
The appellant further asserts that counsel did not show that Smotherman’s identification of him and of his vehicle was not credible. Specifically, he alleges that counsel should have introduced evidence that Smotherman initially mistook Perry for the appellant; that he misidentified Perry’s vehicle; and that he .referred to the perpetrators as “they.” (Appellant’s brief at p. 82.) For the reasons set forth in Part I.B.2.a. of this opinion, the appellant has not shown that the presentation of such evidence would probably have changed the outcome .of his trial. Although he has made bare allegations, he has not supported them with facts and evidence to show that counsel rendered *291 ineffective assistance in this regard. Therefore, he has not satisfied his burden of pleading and proof pursuant to Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Accordingly, he is not entitled to relief on this claim.
4.
In addition, the appellant asserts that counsel did not present documentary evidence to show that he did not have a vehicle that matched the description Smotherman gave. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to present evi- . dence proving that his car had been repossessed and, thus, that Hinton did not own a car matching the description given by Mr. Smotherman. ... At trial, Hinton testified that he had owned a 1975 Chevrolet Caprice, that it was repossessed in April 1985 by. Colonial Bank, and that he did not drive the car again after it was repossessed. (T.R. 1492-1495) Therefore, any additional evidence of records proving this car had been repossessed prior to the Quincy’s robbery would be cumulative. Accordingly, Hinton has not met his burden of proving that his trial counsel was deficient for failing to investigate and uncover records relating to the repossession of his car because those records would be merely cumulative to evidence already presented to the jury. See Do-byne v. State, 805 So.2d 733, 755-756 (Ala.Crim.App.2000) (Defendant failed to prove that trial counsel was ineffective for failure to investigate when the additional evidence was cumulative to that evidence presented at trial.); Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’). Accordingly, this claim is dismissed.”
(C.R. 1550-51.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
5.
Finally, the appellant asserts that counsel did not present evidence that the trip from the warehouse where he was working to Quincy’s would have taken twenty to twenty-three minutes. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to obtain expert assistance to establish that he could not have driven between his job site and the Quincy’s in the time required under the State’s theory of the case....
[[Image here]]
“... Hinton conceded at the eviden-tiary hearing that his trial counsel presented ‘a very, very powerful alibi’ at the trial; therefore, his trial counsel was not ineffective for not presenting this type of alibi testimony. (R. 56) In addition, Officer K.D. Goodwin testified that it would take approximately 17 minutes to drive from the Bruno’s warehouse to Quincy’s. (T.R. 1022-1025) Thus, Hinton’s trial counsel had the opportunity to ... call a rebuttal witness; however, he chose not to do this. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’). Therefore, this claim is dismissed.”
(C.R. 1568-70.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. We also note that trial counsel questioned Goodwin extensively about various routes between the *292 warehouse and Quincy’s and how long the drive would take. The appellant has not shown that his counsel’s performance was deficient and that he was prejudiced by that deficient performance. Therefore, he is not entitled to relief on this claim.
The appellant also asserts that counsel did not interview witnesses Johnny Hall and Charlie Turner, who would have testified that he could not have left the Bruno’s warehouse without being detected. However, we have reviewed the trial testimony and the proffer regarding Hall’s and Turner’s testimony, and we conclude that Hall’s and Turner’s testimony would have simply been cumulative to evidence that counsel covered extensively at trial. Therefore, the appellant has not shown that his counsel’s performance was deficient and that he was prejudiced by that deficient performance. Accordingly, he is not entitled to relief on this claim.
D.
Fourth, the appellant contends that counsel rendered ineffective assistance during both phases of his trial.
1.
First, the appellant asserts that counsel did not present, in support of his motion to suppress Smotherman’s out-of-court identification, evidence that the identification was tainted by Smotherman’s conversations with Reginald Payne White, that Smotherman did not describe an obvious scar on his nose, and that Smotherman gave inconsistent descriptions of the perpetrator’s vehicle. In his amended petition, he made only the following bare allegations:
“Trial counsel failed to adequately support the motion for suppression of the identification of Mr. Hinton based on the unduly suggestive photo-lineup, the circumstances of Smotherman’s identification, and the inconsistencies in Smoth-erman’s description of the suspect’s vehicle.”
(C.R. 422.) Also, the. appellant did not present any evidence to support this claim during the evidentiary hearing.
In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing ‘to adequately support the motion for suppression of the identification of Mr. Hinton based on the unduly suggestive photo-lineup, the circumstances of Smotherman’s identification, and the inconsistencies in Smoth-erman’s description of the suspect’s vehicle.’ (Third Amended Petition at paragraph 52) ...
[[Image here]]
“... ‘Trial counsel is not ineffective for having an objection overruled or a motion denied.’ Boyd v. State, 746 So.2d 364, 402 (Ala.Crim.App.1999)....
“... [T]his claim is dismissed in accordance with Alabama Rule of Criminal Procedure 32.3 because Hinton fails to allege what additional evidence or arguments that could have been offered in support of the motion to suppress in order to prove that his counsel’s performance was deficient. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’). Accordingly, this claim is dismissed.”
(C.R. 1565-68.) The record supports the circuit court’s findings, and we adopt them as part of this opinion.
Although the appellant provides a few more specific allegations in his post-hearing brief and in his brief to this court, “ ‘ “[t]his court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the rec *293 ord.” Moore v. State, 457 So.2d 981, 989 (Ala.Cr.App.1984), cert. denied, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985).’ Garnett v. State, 555 So.2d 1153 (Ala.Crim.App.1989).” Similton v. State, 672 So.2d 1363, 1366 (Ala.Crim.App.1995). For the reasons set forth herein, the appellant has not satisfied his burden of pleading and proof as to this claim. See Rules 32.3 and 32.6(b), Ala. R.Crim. P. Therefore, he is not entitled to relief on this claim.
2.
Second, the appellant alleges that counsel did not adequately investigate and present evidence that the real killer telephoned his home, his mother, and his attorney to confess to the offenses for which he was being tried. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to present evidence regarding phone calls received by trial counsel, counsel’s secretary, and Hinton’s mother from a person claiming responsibility for the Davidson/Vason murders.... Trial counsel presented the testimony of Julia Self, his office manager, who testified out of the presence of the jury that she received a phone call at the office from a person who identified himself as Gerald Washington. (T.R. 1555-1560) According to Ms. Self, the caller told her that someone had called Parkway Church of Christ and claimed responsibility for the murders for which Hinton was being tried. (T.R. 1556) Trial counsel subsequently explained to the trial court how he had tried to follow up on this phone call and he told the court about a similar call he received at home. (T.R. 1561-1567) Trial counsel had a duty to reasonably investigate a defendant’s case, but counsel is not required to ‘discover every shred of evidence’:
“ ‘While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, “this duty only requires a reasonable investigation.” Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a “substantial investigation into each of the plausible lines of defense.” Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). “A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.” Id., 466 U.S. at 686, 104 S.Ct. at 2063.
“ ‘ “The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.” Id., 466 U.S. at 691, 104 S.Ct. at 2066. Jones v. State, 753 So.2d at 1191.
“Dobyne v. State, 805 So.2d 733, 754 (Ala.Crim.App.2000). Accordingly, the record at trial proves that trial counsel reasonably investigated this lead regarding a caller claiming responsibility for the crimes for which Hinton was convicted and, thus, trial counsel was not ineffective. See Thomas v. State, 766 So.2d 860, 886-889 (Ala.Crim.App.1998) (De *294 fense counsel was not ineffective for failing to conduct adequate investigation of anonymous caller because counsel attempted to ascertain the validity of the information, the caller’s testimony would have been inadmissible hearsay, and there was strong evidence that defendant committed the crimes.); see also Dobyne v. State, 805 So.2d 733, 755-756 (Ala.Crim.App.2000) (Defendant failed to prove that trial counsel was ineffective for failure to investigate when the additional evidence was cumulative to that evidence presented at trial.)....
“... Hinton did not meet his burden of proving the facts that would entitle him to relief under Alabama Rule of Criminal Procedure 32.3. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner failed to meet burden of proving the facts that would entitle him to relief under Rule 32.3 because petitioner presented no evidence in support of his claim.). Hinton presented no evidence proving that this mystery caller could have been found or what he/she would have testified to if found. Thus, this claim is dismissed.”
(C.R. 1552-55.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
3.
Third, the appellant alleges that counsel did not investigate or present evidence that crimes with the same modus operandi continued after he was arrested. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to investigate and present evidence of other crimes with a similar modus operandi that were committed after he was arrested....
[[Image here]]
“... Trial counsel’s performance was not deficient because he did present evidence that other similar crimes occurred after Hinton’s arrest. At trial, Hinton presented the testimony of Birmingham Police Investigator James Chambliss, who testified that crimes similar to the Davidson and Vason murders occurred after Hinton was arrested and that no one had been apprehended for those crimes. (T.R. 1311-1320) Therefore, this claim is dismissed because Hinton failed to prove that his trial counsel was ineffective. See Strickland v. Washington, 466 U.S. at 687. For this same reason, this claim is dismissed in accordance with Alabama Rule of Criminal Procedure 32.3 because Hinton fails to meet his burden of proving the facts necessary to entitle him to relief.”
(C.R. 1563-65.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
4.
Fourth, the appellant alleges that counsel did not make a Batson[14] objection at trial and on appeal on the basis of racial discrimination. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to make a Batson motion. This claim is dismissed for the following reasons:
“... Hinton alleges that his trial counsel was ineffective for failing to make a Batson motion; however, Hinton bears the burden of proving that counsel *295 was ineffective for failing to make a Batson motion:
“ ‘To prevail on a claim of ineffective assistance of counsel based upon an attorney’s failure to make a Batson motion, a defendant must show that there was a prima facie case of “purposeful discrimination by the State in the jury selection process.” [Ex parte] Yelder, 575 So.2d [137], 138 [ (Ala.1991) ]. If the record does not show a prima facie case of purposeful discrimination, then an appellate court will not assume that the defendant’s-attorney was ineffective in not making a Batson motion. See, e.g., Patrick v. State, 680 So.2d 959, 962 (Ala.Crim.App.1996). Rather, there is “a strong presumption that counsel’s conduct was appropriate and reasonable.” Id. at 961.’
“Ex parte Frazier, 758 So.2d 611, 616 (Ala.1999). Where a prima facie case may have existed, but the record did not reflect it because counsel did not record the race and gender of the venire-members, the defendant still bears the burden of presenting evidence to prove the prima facie case because error cannot be predicated on a silent record. See id.
“In his petition, Hinton alleges only that the State used nine of its peremptory challenges to remove African-Americans from the venire. The Alabama appellate courts have consistently held that a Batson motion based strictly on the number of African-American venire-members stricken from the jury is not sufficient to prove a prima facie case of racial discrimination. See Ex parte Pressley, 770 So.2d 143, 147 (Ala.2000); Harrell v. State, 555 So.2d at 268 (‘The defendant must offer some evidence in addition to the striking of blacks that would raise the inference of discrimination.’); Ex parte Trawick, 698 So.2d 162, 168 (Ala.1997) (‘Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.’); McElemore v. State, [798 So.2d 693] (Ala.Crim.App.2000) (‘It is important that the defendant come forward with facts, not just numbers alone, when asking the trial court to find a prima facie case of racial discrimination.’); Powell v. State, 796 So.2d 404, 431 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001) (‘A defendant fails to establish a prima facie case of discrimination under Batson and Ex parte Branch where the defendant fails to show any evidence of discrimination other that the number of African-American venire members who were struck.’); Hall v. State, [820 So.2d 113] (Ala.Crim.App.1999) (‘Without more, we do not find that the number of strikes this prosecutor used to remove [blacks] from the venire is sufficient to establish a prima facie case of discrimination.’); Dinkins v. State, 701 So.2d 302, 303 (Ala.Crim.App.1995) (‘Merely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case.’).
“Because Hinton fails to allege or prove disparate treatment in the State’s use of its peremptory challenges, as required by Ex parte Branch, 526 So.2d 609, 622, 623 (Ala.1987), Hinton has not properly alleged nor proved that his trial counsel was ineffective for not making a Batson motion. Rather, it is presumed that ‘counsel’s conduct was appropriate and reasonable.’ Ex parte Frazier, 758 So.2d 611, 616 (Ala.1999). Indeed, counsel indicated that it was pleased with the jury selected at trial. (T.R. 388) ...
*296 “... [T]his claim is dismissed in accordance with Alabama Rule of Criminal Procedure 32.3 because Hinton fails to meet his burden of proving the facts necessary to entitle him to relief. Hinton presented absolutely no evidence of the veniremembers’ race, disparate treatment, or of how the State used its peremptory strikes. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner who presented no evidence in support of claim did not meet his burden of pleading and proving by a preponderance of the evidence facts that would entitle him to relief under Rule 32.3.). Thus, this claim is dismissed.
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to allege facts necessary to show that counsel could have proved a prima facie case in support of a Batson motion. The only specific allegation offered in support of what counsel could have stated in a Bat-son motion is that the State removed nine of the fourteen African-American veniremembers; however, Hinton presents no evidence in support of this allegation. Even so, a Batson motion based solely on the number of African-Americans removed from the venire will not prove a prima facie case of discrimination. See Ex parte Pressley, 770 So.2d 143, 147 (Ala.2000). Though Hinton alleges disparate treatment during the ve-nire as an additional factor, Ex parte Branch places the burden of proving additional facts and circumstances raising an inference of racial discrimination on the petitioner; thus, a vague allegation of disparate treatment without specific examples does not satisfy Hinton’s burden of pleading with specificity as required by Rule 32.6(b). See Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). In addition, counsel was not questioned about this and the record is silent on this matter; thus, this court must presume that counsel acted reasonably. Thus, this claim is dismissed.”
(C.R. 1570-75.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
5.
Fifth, the appellant alleges that counsel did not secure a transcript of critical portions of the proceedings, including bench conferences and portions of the jury selection proceedings. In his amended petition, he made only the following bare allegations:
“Trial counsel’s conduct constituted ineffective assistance of counsel when he failed to secure transcription of critical portions of the proceedings, thereby failing to properly preserve the record for review on appeal. There was no strategic basis for trial counsel to not ensure a complete transcript of the jury selection process was preserved. The failure of trial counsel to ensure that all aspects of Mr. Hinton’s trial were transcribed, and especially, trial counsel’s failure to ensure that the record contained information relevant to jury selection and the composition of the jury pool, prevented Mr. Hinton from receiving a full review of his case and has precluded him from adequately litigating such claims as the improper denial of strikes for cause and improper elimination of African-American veniremembers by the prosecution. Dobbs v. Zant, 506 U.S. 357 (1993).
[[Image here]]
“... Trial counsel did not adequately preserve the record by failing to have transcribed critical sections of the trial including the bench conferences and parts of the jury selection. (See, e.g., R. *297 445-446, 490, 505-506, 575, 582, 598, 600-601, 612, 615, 715-716, 739, 752, 773, 939-940, 966, 970, 997, 1031, 1036, 1054, 1058, 1069, 1151, 1218, 1232, 1234, 1337, 1366, 1454, 1486, 1536, 1537, 1554, 1570, 1668, 1705, 1708, 1896.) The failure of defense counsel to preserve this information for the record restricted Mr. Hinton’s ability to raise meritorious issues on appeal.”
(C.R. 424-26.) Also, during the evidentia-ry hearing, the appellant did not present any evidence to support this claim.
In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to have portions of the jury selection and bench conferences transcribed. This claim is dismissed for the following reasons:
“... In Boyd v. State, 746 So.2d 364, 381-382 (Ala.Crim.App.1999), a Rule' 32 petitioner similarly claimed that his trial counsel was ineffective for not having part of the voir dire and bench conferences transcribed; the Alabama Court of Criminal Appeals noted that ‘a court reporter has never been required to transcribe bench conferences or to record the striking of the jury unless requested to do so.’ Id. at 381-382 (citing Ex parte Harris, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504 (1995)).[4] Because the defendant only made speculative allegations about how he was prejudiced by his trial counsel not having the jury selection transcribed, the Court found that this claim was properly dismissed under Alabama Rule of Criminal Procedure 32.3 for failing to meet his burden of proof and under Alabama Rule of Criminal Procedure 32.6 as a bare allegation. Id. at 382. Similarly, Hinton only made speculative allegations as to how he may have been prejudiced without offering any evidence as to how he was actually prejudiced. Accordingly, this claim is dismissed because Hinton has not proved that his counsel was ineffective.
“[Also], this claim dismissed for lack specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to specifically allege how he was prejudiced by the omission of portions of the jury selection from the record. Hinton only makes a general allegation of prejudice without specific examples.
(C.R. 1584-86.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
6.
Sixth, the appellant alleges that counsel did not ask the trial court to instruct on the lesser offense of felony murder. In his petition, he made only the following bare allegations:
“Trial counsel failed to request any special jury instructions, including, but not limited to, failing to ask that the jury be instructed on lesser included offenses of robbery murder, as Mr. Hinton was entitled to have them instructed. Felony murder during the course of a robbery is a lesser crime than capital murder under Alabama law. See Womack v. State, 435 So.2d 754, 763 (Ala.Crim.App.), aff'd, 435 So.2d 766 (Ala.1983), cert. denied, 464 U.S. 986 (1983) (the *298 trial court properly instructed the jury as to the ‘intent to kill requirement’ by instructing the jury that the felony murder doctrine was relevant only as a lesser included offense of noncapital murder, and that the jury could not convict the defendant for capital murder without finding beyond a reasonable doubt that he had possessed the intent to kill); Ex parte Jackson, 674 So.2d 1365, 1367-68 (Ala.1994) (instruction on felony murder as a lesser included offense of the offense of murder committed during the course of a robbery was proper). Had counsel requested a lesser included offense instruction on felony murder, Mr. Hinton’s jury would not have been restricted to a choice between conviction for a capital offense and acquittal. In Beck v. Alabama, this Court held that ‘a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict.’ Beck v. Alabama, 447 U.S. 625, 627 (1980).”
(C.R. 424-25.) Also, he did not present any evidence to support this claim during the evidentiary hearing.
In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to request a jury instruction on the lesser included offense of felony robbery-murder. This claim is dismissed for the following reasons:
“... Defendants are entitled to jury instructions on lesser-included offenses; however, defendants are not entitled to jury instructions on lesser-included offenses where there is no evidence to support such a charge. See Beck v. Alabama, 447 U.S. 625, 638 (1980); Hopper v. Evans, 456 U.S. 605, 611 (1982); Hodges v. State, [856 So.2d 875] (Ala.Crim.App.2001).
“The Alabama Supreme Court reviewed a similar claim in Ex parte Stork, 475 So.2d 623 (Ala.1985), where it considered ... ‘whether a defendant is entitled to a jury charge on a lesser-included offense when he denies committing the crime itself.’ Dorsey v. State, [881 So.2d 460, 514] (Ala.Crim.App.2001). Though the courts have traditionally found it proper to deny a request for a jury instruction when the requested instruction is inconsistent with the defense, the Court found that a defendant’s claim of innocence is not a bar to a jury instruction on a lesser-included offense. Id. at [514]. Instead, the Court found that there must be evidence to support the lesser-included offense before the defendant is entitled to the jury instruction. Id. at [515]. In this case, there is no evidence that the murders of Thomas Vason and John Davidson were anything but intentional; therefore, there was no evidence in the record to support a jury instruction for the lesser-included offense of felony murder. Thus, Hinton would not have been entitled to a jury instruction on a lesser included offense even if his counsel had requested it....
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b). Hinton makes a broad allegation that his trial counsel was ineffective for failing to request a jury instruction on the lesser-included offense of felony murder; however, he fails to allege the factual basis necessary to prove that the murder of John Davidson and Thomas Vason were committed in such a way as to support a jury instruction on a lesser included offense. Even if Hinton had *299 been entitled to such a jury instruction, he failed to question trial counsel about why he chose not to request it; thus, with a silent record, the Court must presume that trial counsel acted reasonably. Without doing so, Hinton fails to allege a factual basis that would entitle him to relief if proved true.”
(C.R. 1580-82.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
7.
Seventh, the appellant asserts that counsel did not object to misconduct by the prosecutor. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to object to numerous instances of improper conduct by the prosecutor. This claim is dismissed for the following reasons:
“... In this claim, Hinton alleges that trial counsel was ineffective for failing to object to the prosecutorial misconduct of statements made during the trial. While Hinton points to certain statements made during trial and nothing more, Hinton has not proved that the outcome of his trial would have been different without those statements. Without such a showing, Hinton fails to prove that these alleged statements prejudiced him and that, thus, his trial counsel was ineffective for not objecting. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’) ....
“... [T]his claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b). Hinton makes broad allegations that his trial counsel was ineffective for failing to object to alleged instances of prosecutorial misconduct; however, he fails to allege the factual basis necessary to prove that these incidents prejudiced the outcome of his trial. In addition, Hinton failed to question his counsel regarding the alleged incidents of prosecu-torial misconduct; thus, the record is silent and this Court must presume that counsel acted reasonably. See Thomas v. State, [824 So.2d 1, 24] (Ala.Crim.App.1999) (‘[T]he failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful.’). Without doing so, Hinton fails to allege the factual basis necessary to show how he is entitled to relief.”
(C.R. 1582-84.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
8.
Eighth, the appellant asserts that counsel did not identify jurors who would automatically sentence him to death and did not conduct adequate voir dire examination to determine whether venire-members were biased or should otherwise be struck for cause. In his amended petition, he made only the following bare allegations:
“Trial counsel failed to adequately examine jurors to identify those who would, based on a capital conviction, automatically sentence Mr. Hinton to death in violation of his constitutionally protected rights and voir dire potential jurors in any way to effectively discern if they would be biased or should otherwise be struck for cause.”
*300 (C.R. 426.) Also, he did not present any evidence to support this claim during the evidentiary hearing.
In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to adequately examine jurors to determine those who would automatically sentence him to death if he were convicted of capital murder. This claim is dismissed for the following reasons:
“... The trial court conducted voir dire and asked the veniremembers if any of them had fixed opinions regarding the imposition of the death penalty and the following veniremembers indicated a fixed opinion towards the death penalty: V.C., L.H., A.H., V.H., S.H., T.L., C.M., B.O., and B.W. (T.R. 111-113, 226-228) The trial court then questioned these veniremembers about this during individual voir dire. (T.R. 234-235, 244-248, 254-255, 264-267, 275-285, 297-300) As a result, veniremembers C.M. and L.H. were removed for cause because they could not vote for the death penalty under any circumstances and T.L. was removed for cause because he would only vote for the death penalty if Hinton were convicted of capital murder.[5] (T.R. 286, 247, 282) The remaining venire-members indicated that they would not automatically vote for the death penalty if Hinton were convicted of capital murder. (T.R. 234-235, 264-267, 297-300) Hinton fails to allege or prove what his trial counsel could have done differently or how he was prejudiced. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’)....
“... [Tjhis claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to specifically allege the factual basis that, if proved true, would warrant post-conviction relief because he does not allege how counsel’s performance was deficient or how he was prejudiced in regard to death-qualifying the jury. See Williams v. State, 783 So.2d 108, 130 (Ala.Crim.App.2000) (Trial court correctly dismissed petitioner’s claim that his trial counsel was ineffective for not adequately questioning veniremembers about whether they would automatically vote to impose the death penalty because he did not meet the specificity requirements of Rule 32.6(b) or burden of proof under Rule 32.3.); See also Callahan v. State, 767 So.2d 380, 389 (Ala.Crim.App.1999). In addition, Hinton failed to make any showing of prejudice. Accordingly, this claim is dismissed.
(C.R. 1586-88.) The record supports the circuit court’s.findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
9.
Ninth, the appellant alleges that counsel
“conducted no investigation, prepared no strategy, presented no evidence other than Mr. Hinton’s unprepared statement, and utterly failed to advocate for Mr. Hinton at the life-or-death stage of his capital trial. Counsel conducted not a single mitigation interview and failed to obtain information regarding Mr. Hinton’s family and social history, educational history, medical history, mental health history, correctional history, and *301 any community or cultural influences. Counsel called no witnesses and presented no documentary or other evidence at the penalty phase. Mr. Hinton exercised his right to testify and made a brief unprepared statement to the jury without counsel’s involvement. (R. 1876-77.) Trial counsel’s penalty phase advocacy consisted entirely of a four-sentence opening statement and two-sentence closing statement. The entire penalty phase — from the State’s opening through the State’s rebuttal closing— encompasses only nine transcript pages. (R. 1871-79.)
“Likewise, counsel offered no defense against the imposition of the death penalty at the sentencing hearing before the judge. Even after the jury recommended death, counsel did nothing to convince the court to spare Mr. Hinton’s life. Counsel did not even talk with Mr. Hinton before the sentencing hearing about whether he should testify. In fact, counsel told the sentencing judge that he had no idea what Mr. Hinton was going to say. (R. 1917.)”
(Appellant’s' brief at pp. 92-98.) In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to call any other witnesses in mitigation for the penalty phase. This claim is dismissed for the following reasons:
. “First, this claim is dismissed under Alabama Rule of Criminal Procedure 82.3because Hinton fails to plead or prove the facts necessary to entitle him to relief. Hinton did not allege who trial counsel could have called or to what those witnesses would have testified. See Callahan v. State, 767 So.2d 380, 388-389 (Ala.Crim.App.1999) (Bare allegations that trial counsel was ineffective were due to be dismissed under Rule 32.3because petitioner did not allege the facts necessary to entitle him to relief.). Moreover, Hinton presented no evidence of witnesses who could have testified for mitigation purposes at his trial. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner failed to meet burden of proving the facts necessary to entitle him to relief under Rule 32.3because the petitioner presented no evidence in support of his claim.). Therefore, this claim is dismissed.
“... In addition, Hinton fails to allege how this was a deficient trial strategy that prejudiced the outcome of his verdict. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999)(‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’)....
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to specifically allege the factual basis that, if proved true, would warrant post-conviction relief. Hinton had not alleged how his counsel’s performance was deficient or how he was prejudiced by his counsel not calling additional witnesses to testify in mitigation; he merely asserts that this is per se ineffectiveness. Hinton did not meet his burden of pleading with specificity because he did not allege who counsel could have called and to what these witnesses would have testified. Hinton failed to meet his burden of proof, as well. Therefore, this claim is dismissed.
“... Hinton alleges that his trial counsel was ineffective for failing to obtain complete and accurate information regarding his ‘family and social history, educational history, medical history, mental health history, correctional histo *302 .ry, and any community and cultural influences.’ ...
[[Image here]]
“... [T]his claim is dismissed under Alabama Rule of Criminal Procedure 32.3because Hinton fails to plead or prove the facts necessary to entitle him to relief. Hinton did not allege what specific records trial counsel could have presented or what those documents would have testified in mitigation. See Callahan v. State, 767 So.2d 380, 388-389 (Ala.Crim.App.1999) (Bare allegations that trial counsel was ineffective were due to be dismissed under Rule 32.3because petitioner did not allege the facts necessary to entitle him to relief.). Moreover, Hinton presented no evidence of records that could have been used for mitigation purposes at his trial. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner failed to meet burden of proving the facts necessary to entitle him to relief under Rule 32.3because the petitioner presented no evidence in support of his claim.). Therefore, this claim is dismissed.
[[Image here]]
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to allege a factual basis that, if proved true, would warrant postconviction relief. Hinton does not allege how counsel’s performance was deficient by alleging what evidence in mitigation could have been presented and he does not specifically allege how he was prejudiced. Accordingly, this claim is dismissed as a bare allegation.
“... Hinton alleges that his trial counsel was ineffective for failing to prepare a penalty phase strategy and effectively make a case for saving his life. This claim is dismissed for the following reasons:
“First, this claim is dismissed under Alabama Rule of Criminal Procedure 32.3because Hinton fails to plead or prove the facts necessary to entitle him to relief. Hinton did not allege what other mitigation strategy would have been effective or what evidence could have been presented in support.of another mitigation strategy. See Callahan v. State, 767 So.2d 380, 388-389 (Ala.Crim.App.1999) (Bare allegations that trial counsel was ineffective were due to be dismissed under Rule 32.3 because petitioner did not allege the facts necessary to entitle him to relief.). Moreover, Hinton presented no evidence of what could have been presented in a different mitigation strategy at his trial. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner failed to meet burden of proving the facts necessary to entitle him to relief under Rule 32.3because the petitioner presented no evidence in support of his claim.). Therefore, this claim is dismissed.
"... The record clearly, shows that throughout the trial and penalty phase, the defense theory was innocence because Hinton and counsel maintained his innocence throughout the proceedings. Hinton has not alleged nor offered any evidence to prove how his trial counsel’s performance was deficient or how he was prejudiced by it....
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to specifically allege the factual basis that, if proved true, would warrant post-conviction relief. Hinton had not alleged how his counsel’s performance was deficient or how he was prejudiced by his counsel’s choice in defense strategy. Instead, Hinton merely asserts that his counsel *303 was ineffective because the jury chose not to believe it. In addition, Hinton has not met his burden of proof under Rule 32.3. Therefore, this claim is dismissed because Hinton has not met his burden of pleading with specificity or his burden of proof.
“... Hinton alleges that his trial counsel was ineffective for failing to investigate or present mitigating evidence and mitigating witnesses. This claim is dismissed for the following reasons:
“First, this claim is dismissed under Alabama Rule of Criminal Procedure 32.3 because Hinton fails to plead or prove the facts necessary to entitle him to relief. Hinton did not allege what other witnesses or evidence could have been presented in mitigation at the trial. See Callahan v. State, 767 So.2d 380, 388-389 (Ala.Crim.App.1999) (Bare allegations that trial counsel was ineffective were due to be dismissed under Rule 32.3 because petitioner did not allege the facts necessary to entitle him to relief.). Moreover, Hinton presented no evidence of what could have been presented in mitigation at his trial. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner failed to meet burden of proving the facts necessary to entitle him to relief under Rule 32.3 because the petitioner presented no evidence in support of his claim.). Therefore, this claim is dismissed.
[[Image here]]
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to specifically allege the factual basis that, if proved true, would warrant post-conviction relief. Hinton has not alleged how his counsel’s performance was deficient or how he was prejudiced by his counsel’s choice in defense strategy. Instead, Hinton offers only a bare allegation and, thus, he has not met his burden of pleading with specificity as required by Rule 32.6(b). Thus, this claim is dismissed.
“... Hinton alleges that his trial counsel was ineffective for failing to consult or communicate with him before his testimony in the penalty phase....
“... Hinton alleges that his trial counsel was ineffective for not communicating with him prior to testifying at the sentencing hearing and he bases this argument on the contention that ‘Counsel stated before the judge and jury that he “had no idea what Mr. Hinton was going to say.” ’ (Paragraph 66 of Petitioner’s third amended petition) The actual statement made by counsel is as follows:
“‘Judge, let me make aware to the Court that Mr. Hinton has requested the opportunity to testify. I have no particular idea of the subject matter of testimony so there’s no way of questioning him. I don’t see how it could make any difference if he just testifies in narrative. They have whatever opportunity they want to talk to him. I don’t know the subject matter.’ ■
“(T.R. 1917-1918) Because this statement was made at the sentencing hearing, this statement has no bearing on trial counsel’s communication with Hinton prior to his testimony before the jury during the penalty phase. In fact, Hinton testified before the jury during the penalty phase and it was not in narrative form. (T.R. 1876-1877) Accordingly, the record does not support his contention that counsel did not advise Hinton about his testimony before the jury; instead, it appears that counsel gave Hinton the opportunity to speak on his own behalf at the sentenc *304 ing hearing. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’). Hinton fails to allege how counsel’s performance was deficient or how he was prejudiced. Accordingly, this claim is dismissed.
“Second, this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to allege a factual basis that, if proved true, would warrant postconviction relief. Hinton does not allege how counsel’s performance was deficient by allowing him to speak freely to the trial court about his sentence and he does not specifically allege how he was prejudiced. Accordingly, this claim is dismissed as a bare allegation. In addition, Hinton failed to meet his burden of proof under Rule 32.3. Hinton did not question trial counsel regarding this issue and, thus, the record is silent. This Court cannot predicate error on a silent record, thus, this claim is dismissed.”
(R. 1589-1602.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief in this regard.
10.
Tenth, the appellant alleges that counsel did not object to testimony by two bailiffs that he said that he knew how to beat a lie detector test. In its order on the petition, the circuit court found as follows: ,
“Hinton alleges that his trial counsel was ineffective for failing to object to the State presenting testimony at the sentencing hearing from two bailiffs about ... Hinton saying that he knew how to beat a polygraph. This claim ,is dismissed for the following reasons:
“... Hinton argues that his trial counsel was ineffective [for not] objecting to the State presenting the testimony of two bailiffs at the sentencing hearing because this testimony impermissibly influenced the jury’s sentence recommendation. This jury recommended death at the end of the penalty phase in the trial on pages 1900-1901 of the trial record; however, the two bailiffs testified before the judge only after the penalty phase at the sentencing hearing on pages 1909-1916 of the trial record. Therefore, it was not possible for this testimony to have influenced the jury’s recommendation in any way because the jury had already rendered its sentencing recommendation and the jury had been released. In addition, Hinton ‘opened the door’ to this testimony because he had testified during the penalty phase that he had passed the polygraph. (T.R. 1877) Therefore, his counsel cannot be deficient for not objecting to testimony that is admissible. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’)....
“... [T]his claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to allege a factual basis that, if proved true, would warrant post-conviction relief. Hinton first alleges facts that can be directly refuted by the record because the testimony that he alleges as impermissibl[y] influencing the jury was not presented to the jury. In addition, Hinton does not allege how counsel was deficient not for objecting to evidence that is admissible. Accordingly, this claim is dismissed as a bare allegation.”
*305 (C.R. 1602-04.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
11.
Eleventh, the appellant alleges that counsel did not object to the instruction that aggravating circumstances should be deemed proven based on findings made during the guilt phase of the trial. In its order on the petition, the circuit court found as follows:
“Hinton alleges that his trial counsel was ineffective for failing to object to the presumption at the penalty phase that any aggravating circumstances proven beyond a reasonable doubt during the guilt/innocence phase were proved beyond a reasonable doubt at the penalty phase. This claim is dismissed for the following reasons:
“... Section 13A-5-43(e) of the 1975 Code of Alabama provides the following:
“ ‘At the sentencing hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstances which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proved beyond a reasonable doubt for purposes of the sentencing hearing.’
“Trial counsel can not be deficient for failing to object to something that is established by statute. See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’)....
“... [T]his claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton failed to specifically allege the factual basis that, if proved true, would warrant post-conviction relief. Thus, this claim is dismissed.”
(C.R. 1604-05.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this claim.
12.
Twelfth, the appellant alleges that
“[c]ounsel failed to provide effective assistance on appeal because he did not raise the State’s discriminatory use of peremptory challenges and the denial of funds necessary to protect Mr. Hinton’s rights, see United States ex rel. Erickson v. Shomig, 162 F.Supp.2d 1020, 1042-49 (N.D.Ill.2001), failed to move to supplement the record to show the racial composition of the venire and the race of each venireperson struck by the prosecution, did not consult or communicate with Mr. Hinton in preparation of his appeal, and denied Mr. Hinton his rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the state laws and constitution of Alabama.”
(Appellant’s brief at pp. 93-94.) In its order on the petition, the circuit court found as follows:
“Hinton alleges that his counsel was ineffective on appeal for not raising an alleged Batson violation and for not consulting him prior to filing his appeal. This claim is dismissed for the following reasons:
“... Though Hinton alleges that his counsel was ineffective for not consulting with him prior to filing his appeal, he does not allege how counsel’s perform- *306 anee was deficient or how he was prejudiced. Hinton also did not offer proof of this allegation. Hinton also alleges that his trial counsel was ineffective for failing to argue a Batson violation on appeal. To prove that counsel was ineffective on appeal, Hinton must prove that the outcome of his appeal would have been different but for counsel’s deficient performance. See Jones v. State, [816 So.2d 1067, 1071] (Ala.Crim.App.2000) (The standard for ineffective assistance of appellate counsel is the same as the standard for ineffective assistance of trial counsel.). To do this in relation to a Batson violation on appeal, Hinton bears the burden of proving that.counsel could have made a prima facie case of discrimination for a Batson motion:
“ ‘To prevail on a claim of ineffective assistance of counsel based upon an attorney’s failure to make a Batson motion, a defendant must show that there was a prima facie case of “purposeful discrimination by the State in the jury selection process.” [Ex parte] Yelder, 575 So.2d [137], 138 [ (Ala.1991) ]. If the record does not show a prima facie case of purposeful discrimination, then an appellate court will not assume that the defendant’s attorney was ineffective in not making a Batson motion. See, e.g., Patrick v. State, 680 So.2d 959, 962 (Ala.Crim.App.1996). Rather, there is “a strong presumption that counsel’s conduct was appropriate and reasonable.” Id. at 961.’
“Ex parte Frazier, 758 So.2d 611, 616 (Ala.1999). Where a prima facie case may have existed, but the record did not reflect it because counsel did not record the race and gender of the venire-members, the defendant still bears the burden of presenting evidence to prove the prima facie case because error cannot be predicated on a silent record. See Id. Hinton does- not allege the facts necessary to prove a prima facie case of discrimination under Batson v. Kentucky, 476 U.S. 79 (1986); thus, he fails to state a claim showing how his' counsel’s performance was deficient on appeal and, thus, constituted ineffective assistance. Because Hinton has not alleged the facts necessary to prove a prima facie case of purposeful discrimination, it must be assumed that his counsel’s performance was not deficient. See id. Therefore, Hinton has not satisfied the. deficient performance requirement of proving ineffective assistance of counsel. Also, counsel indicated that it was pleased with the jury selected at trial. (R. 388) See Boyd v. State, 746 So.2d 364, 375 (Ala.Crim.App.1999) (‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.’).
“... [T]his claim is dismissed in accordance with Alabama Rule of Criminal Procedure 32.3 because Hinton fails to meet his burden of proving the facts necessary , to entitle him to relief. Hinton fails to allege disparate treatment of the veniremembers. See Callahan v. State, 767 So.2d 380, 388-389 (Ala.Crim.App.1999) (Bare allegations that trial counsel was ineffective were due to be dismissed under Rule 32.3 because petitioner did not allege the facts necessary to entitle him to relief.). Moreover, Hinton presented no evidence of African-American venire-members being removed due to race or disparate treatment of the venire-members. See Dobyne v. State, 805 So.2d 733, 753 (Ala.Crim.App.2000) (Petitioner failed to meet burden of proving the facts necessary to entitle him to relief under Rule 32.3 because the petitioner presented no evidence in support *307 of his claim.). Therefore, this claim'is dismissed.
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to allege a factual basis that, if proved true, would warrant post-conviction relief. Hinton does not allege the facts to show how his counsel was deficient or how his counsel prejudiced him by not consulting him before filing an appeal. Hinton also fails to allege the facts necessary to show how his counsel was deficient in not arguing a Batson violation on appeal. The only specific allegation offered in support of what counsel could have stated in a Batson motion is that the State removed nine of the fourteen African-American veniremembers. A Batson motion based solely on the number of African-Americans removed from the venire will not prove a prima facie case of discrimination. See Ex parte Pressley, 770 So.2d 143, 147 (Ala.2000). Though Hinton alleges disparate treatment during the venire as an additional factor, Ex parte Branch places the burden of proving additional facts and circumstances raising an inference of racial discrimination on the petitioner; thus, a vague allegation of disparate treatment without specific examples does not satisfy Hinton’s burden of pleading with specificity as required by Rule 32.6(b). See Ex parte Branch, 526 So.2d 609, 622 (Ala.1987).
“... Hinton alleges that his trial counsel was ineffective for failing to supplement the record on appeal to note the racial composition of the jury or the race and gender of those removed through peremptory challenges....
[[Image here]]
"... To prove that counsel was ineffective on appeal, Hinton must prove that the outcome of his appeal would have been different but for counsel’s deficient performance. See Jones v. State, [816 So.2d 1067, 1071] (Ala.Crim.App.2000) (The standard for ineffective assistance of appellate counsel is the same as the standard for ineffective assistance of trial counsel.). ‘Failure to make a record of the race or gender of persons against whom the prosecution asserted peremptory strikes not per se ineffective assistance of counsel; it would constitute ineffective assistance only if a prima facie case of purposeful discrimination existed.’ Ex parte Frazier, 758 So.2d 611, 616 (Ala.1999) (citing Ex parte Yelder, 575 So.2d 137, 139 (Ala.1991)). Therefore, Hinton must prove that a prima facie ease of discrimination existed in his jury selection before he can prove that his trial counsel was ineffective for failing to supplement the record to note the race of the veniremembers against whom the State exercised its peremptory strikes. As discussed above, Hinton has not alleged facts necessary to prove a prima facie case of racial discrimination. Accordingly, Hinton fails to state a claim showing how he was prejudiced by his counsel’s decision not to note the racial and gender composition of. the jury or removed veniremembers because he has not presented facts necessary to prove a prima facie case for a Batson motion.
“[Also], this claim is dismissed for lack of specificity in accordance with Alabama Rule of Criminal Procedure 32.6(b) because Hinton fails to allege facts proving that a prima facie case of discrimination existed in order'to prove that his appellate counsel was ineffective for not supplementing the record to note the race and gender of the venire-members: See Ex parte Frazier, 758 So.2d 611, 616 (Ala.1999). In addition, Hinton failed to question his counsel re *308 garding this issue and the record is silent; accordingly, Hinton fails to meet-his burden of proof because this Couit must presume that counsel acted reasonably when the record is silent on the matter. Therefore, this claim is dismissed.”
(C.R. 1608-16.) The record supports the circuit court’s findings, and we adopt them as part of this opinion.[15]
E.
Fifth, the appellant contends that the circuit court erred in dismissing some of his claims as failing to state a claim upon which relief can be granted because there is no material issue of law or fact. Specifically, he contends that ineffective assistance of counsel is a claim and that summary dismissal pursuant to Rule 32.7(d), Ala. R.Crim. P., is moot once a circuit court has conducted an evidentiary hearing. For the reasons set forth herein, the circuit court correctly found that the appellant was not entitled to relief on his ineffective-assistance-of-counsel claims. Because we may affirm a circuit court’s denial of a Rule 32 petition if it is correct for any reason, see Sumlin v. State, 710 So.2d 941 (Ala.Crim.App.1998), we need not address this argument.
F.
Sixth, the appellant contends that the circuit court erred in dismissing some of his ineffective-assistance claims as time-barred based on Charest v. State, 854 So.2d 1102 (Ala.Crim.App.2002). In Ex parte Jenkins, 972 So.2d 159 (Ala.2005), the Alabama Supreme Court overruled this Court’s decision in Charest and stated:
“Given the direction in the Alabama Rules of Criminal Procedure that amendments to Rule 32 petitions are to be allowed at any time before .the trial court enters a judgment, Rule 32.7(b), and that leave to amend is to be freely granted, Rule 32.7(d), we conclude that a restriction on a Rule 32 petitioner’s right to file an amendment by applying principles found in the Alabama Rules of Civil Procedure, such as the relation-back doctrine, should be the subject of careful consideration by the Standing Committee on the Alabama Rules of Criminal Procedure. We decline to rewrite the Rules of Criminal Procedure by sanctioning the incorporation of the relation-back doctrine into those rules when nothing of that nature- presently appears in them.
“To the extent that the following cases applied the relation-back doctrine to proceedings governed by Rule 32, Ala. R.Crim. P., we overrule those cases: Harris v. State, 947 So.2d 1079 (Ala.Crim.App.2004); McWilliams v. State, 897 So.2d 437 (Ala.Crim.App.2004); Giles v. State, 906 So.2d 963 (Ala.Crim.App.2004); Ex parte Mack, 894 So.2d 764 (Ala.Crim.App.2003); DeBruce v. State, 890 So.2d 1068 (Ala.Crim.App.2003); Charest v. State, 854 So.2d 1102 (Ala.Crim.App.2002); and Garrett v. State, 644 So.2d 977 (Ala.Crim.App.1994).”
972 So.2d at 165 (footnote omitted).
Initially, we note that the circuit court entered its order on January 18, 2005, which was before Jenkins was decided. Also, this court may affirm a circuit court’s denial of a Rule 32 petition if it is correct for any reason. See Sumlin v. *309 State, 710 So.2d 941 (Ala.Crim.App.1998). For the reasons set forth herein, the circuit court correctly found that the appellant was not entitled to relief on his ineffective-assistanee-of-counsel claims. Therefore, even though the circuit court’s reliance on Charest is no longer valid, reversal is not required.
G.
Finally, the appellant contends that “[t]he cumulative effect of counsel’s underfunded, deficient and prejudicial performance during the guilt/innocence, penalty, and appellate phases denied [him] adequate representation, due process and a fair trial.” (Appellant’s brief at p. 95.) However, for these reasons set forth herein, the appellant has not established, individually or cumulatively, that he is entitled to relief on his ineffective-assistance-of-counsel claims. Therefore, this argument is without merit.
IV.
The appellant’s fourth argument is that he is entitled to a new trial because the State lost or destroyed evidence.
A.
The appellant contends that the Bessemer Police Department lost a daytimer page on which Smotherman wrote a description of his assailant immediately after he was shot. In its order on the petition, the circuit court found as follows:
“Hinton alleges that the State lost or destroyed exculpatory evidence regarding Smotherman’s identification of Hinton. Specifically, Hinton alleges that the page from Smotherman’s daytimer, where Smotherman wrote his description of Hinton immediately after the robbery, was lost by Bessemer police and never given to Hinton for examination. Sidney Smotherman testified about writing this description in his day-timer before escaping from the Quincy’s food locker and that he gave that sheet of paper to a Bessemer police officer. (T.R. 885-886) This claim is precluded under Alabama Rule of Criminal Procedure 32.2(a)(3) because this could have been, but was not, raised in a pretrial motion or at trial. Where claims raised under Brady v. Maryland, 373 U.S. 83 (1963), are not based upon newly discovered evidence, the procedural bars of Rule 32.2(a) apply. See Williams v. State, 782 So.2d 811, 818 (Ala.Crim.App.2000); Bui v. State, 717 So.2d 6, 27 (Ala.Crim.App.1997). Accordingly, he is precluded from post-conviction relief on this claim under Rule 32.2(a)(3). See Bearden v. State, [825 So.2d 868, 871] (Ala.Crim.App.2001); Dobyne v. State, 805 So.2d 733, 762 (Ala.Crim.App.2000); Daniels v. State, 650 So.2d 544, 551 (Ala.Crim.App.), cert. denied, 650 So.2d 544 (Ala.1994), cert. denied, 115 S.Ct. 1375 (1995); Russ v. State, 640 So.2d 21, 22 (Ala.Crim.App.1994).
“Also, this claim is precluded under Alabama Rule of Criminal Procedure-32.2(a)(5) because this could have been, but was not, raised on appeal. Hinton did not raise this issue on appeal. See Hinton v. State, 548 So.2d 547 (Ala.Crim.App.1988). Therefore, this issue is precluded from post-conviction relief because it could have been, but was not, raised on appeal. See Ex parte Sanders, 792 So.2d 1087, 1090-91 (Ala.2001); Avery v. State, [832 So.2d 664, 665] (Ala.Crim.App.2001); Daniels v. State, 650 So.2d 544, 551 (Ala.Crim.App.), cert. denied, 650 So.2d 544 (Ala.1994), cert. denied, 115 S.Ct. 1375 (1995); Jackson v. State, 612 So.2d 1356, 1357 (Ala.Crim.App.1992).”
*310 (C.R. 1632-34.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. We further note that trial counsel repeatedly questioned witnesses about the daytimer page and the fact that it had been lost. Therefore, the appellant is not entitled to relief on this claim.
B.
The appellant contends that the State returned Smotherman’s vehicle and key to him without testing them for fingerprints. In its order on the petition, the circuit court found as follows:
“Hinton alleges that the State destroyed possible exculpatory evidence by returning the car to Smotherman without testing the car for fingerprints. The State did test the car for fingerprints and presented testimony at trial that there were no usable latent prints found in Smotherman’s car and that, thus, Hinton’s fingerprints were not found in the ear. (T.R. 1133-1135) Therefore, this claim is dismissed in accordance with Alabama Rule of Criminal Procedure 32.3 for failure to plead and prove the facts necessary to entitle him to relief.
“In addition, this claim is precluded under Alabama Rule of Criminal Procedure 32.2(a)(3) because this could have been, but was not, raised in a pretrial motion or at trial. Where claims raised under Brady v. Maryland, 373 U.S. 83 (1963), are not based upon newly discovered evidence, the procedural bars of Rule 32.2(a) apply. See Williams v. State, 782 So.2d 811, 818 (Ala.Crim.App.2000); Bui v. State, 717 So.2d 6, 27 (Ala.Crim.App.1997). The facts surrounding the fingerprint testing of Smotherman’s car were presented at trial and this claim is not based upon any newly discovered evidence. (T.R. 1133— 1135) Accordingly, he is precluded from post-conviction relief on this claim under Rule 32.2(a)(3). See Bearden v. State, [825 So.2d 868, 871] (Ala.Crim.App.2001); Dobyne v. State, 805 So.2d 733, 762 (Ala.Crim.App.2000); Daniels v. State, 650 So.2d 544, 551 (Ala.Crim.App.), cert. denied, 650 So.2d 544 (Ala.1994), cert. denied, 115 S.Ct. 1375 (1995); Russ v. State, 640 So.2d 21, 22 (Ala.Crim.App.1994).
“Also, this claim is precluded under Alabama Rule of Criminal Procedure 32.2(a)(5) because this could have been, but was not, raised on appeal. Hinton did not raise this issue on appeal. See Hinton v. State, 548 So.2d 547 (Ala.Crim.App.1988). Therefore, this issue is precluded from post-conviction relief because it could have been, but was not, raised on appeal. See Ex parte Sanders, 792 So.2d 1087, 1090-91 (Ala.2001); Avery v. State, [832 So.2d 664, 665] (Ala.Crim.App.2001); Daniels v. State, 650 So.2d 544, 551 (Ala.Crim.App.), cert. denied, 650 So.2d 544 (Ala.1994), cert. denied, 115 S.Ct. 1375 (1995); Jackson v. State, 612 So.2d 1356, 1357 (Ala.Crim.App.1992).”
(C.R. 1630-32.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. We further note that trial counsel also elicited testimony about Smotherman’s key being returned to him without having been tested. Therefore, the appellant is not entitled to relief on this claim.
V.
The appellant’s fifth argument is that the absence of any independent judicial review or adjudication of the issues requires that this court grant relief. Specifically, he contends that the circuit court improperly adopted the State’s proposed order.
*311 “‘While.the practice of adopting the State’s proposed findings of fact and conclusions of law is subject to criticism, the general rule is that even when the court adopts proposed findings and conclusions verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991); Weeks v. State, 568 So.2d 864 (Ala.Cr.App.1989), cert. denied, 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 485 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).’
“Wright v. State, 593 So.2d 111, 117-18 (Ala.Cr.App.1991), cert. denied, [506] U.S. [844], 113 S.Ct. 132, 121 L.Ed.2d 86 (1992).”
Holladay v. State, 629 So.2d 673, 687-88 (Ala.Crim.App.1992).
Initially, we note that the circuit court gave both parties the option of submitting proposed orders. Further, the record does not indicate that the circuit court’s decision to deny the petition was clearly erroneous. We do note that the circuit court’s reliance on Charest, supra, is no longer valid, as set forth in Part III.F. of this opinion. However, the circuit court also gave additional or alternative grounds for denying the appellant’s claims. For the reasons set forth in this opinion, the circuit court properly denied the appellant’s petition. Therefore, even if some of the circuit court’s reasons were incorrect, reversal is not required. See Sumlin v. State, 710 So.2d 941 (Ala.Crim.App.1998) (holding that we will affirm a circuit court’s denial of a Rule 32 petition if it is correct for any reason).
VI.
The appellant’s sixth argument is that the failure to provide the defense with competent expert assistance entitles him to relief. This claim is precluded because he could have raised it at trial and on direct appeal, but did not. See Rule 32.2(a)(3) and (5), Ala. R.Crim. P.
VII.
The appellant’s seventh argument is that he was not afforded a fair review in the circuit court. Specifically, he contends that the circuit court erred in ruling that any evidence related to his alibi on the night of the Quincy’s robbery was barred because he raised an alibi defense at trial. During the evidentiary hearing, the circuit court repeatedly explained that the appellant’s alibi had been covered very thoroughly at trial and that, therefore, any additional testimony about his alibi would simply be cumulative to testimony presented at trial. Moreover, the appellant’s Rule 32 attorney conceded that the case “was based on an identification that was rebutted by what we believe to be a very, very powerful alibi.” (R. 56.) Finally, we have reviewed both the trial testimony and the appellant’s evidentiary hearing proffer regarding his alibi, and we conclude that the evidence he proffered was covered thoroughly and extensively at trial. Because the alibi evidence would simply have been cumulative to evidence presented at trial, the circuit court properly excluded it. See Rule 32.1(e)(2), Ala. R.Crim. P.
VIII.
The appellant’s eighth argument is that he is entitled to relief on his remaining claims.
A.
First, the appellant contends that the trial court erred when it consolidated *312 two separate capital murder indictments for trial. This claim is precluded because it was raised and addressed at trial and on direct appeal. See Rule 32.2(a)(2) and (4), Ala. R.Crim. P.
B.
Second, the appellant contends that the trial court erred when it excluded polygraph evidence that would have exonerated him. This claim is precluded because it was raised and addressed at trial and on direct appeal. See Rule 32.2(a)(2) and (4), Ala. R.Crim. P.
C.
Third, the appellant contends that the State’s loss of the test bullets requires a new trial. This claim is precluded because it was raised and addressed on direct appeal. See Rule 32.2(a)(4), Ala. R.Crim. P.
D.
Fourth, the appellant contends that the trial court improperly allowed the State’s experts to testify based on evidence — test bullets — that was not admitted at trial. This claim is precluded because it was raised and addressed on direct appeal. See Rule 32.2(a)(4), Ala. R.Crim. P.
E.
Fifth, the appellant contends that the trial court improperly admitted evidence about the Smotherman offense. This claim is precluded pursuant to the provisions of Rule 32.2(a), Ala. R.Crim. P.
F.
Sixth, the appellant contends that the prosecutor’s misconduct violated his rights. This claim is precluded pursuant to the provisions of Rule 32.2(a), Ala. R.Crim. P.
G.
Seventh, the appellant contends that his convictions and sentences are unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). However, the decision in Ring does not apply retroactively to cases pending on collateral review. See Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004); Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003). Therefore, the appellant’s argument is without merit.
H.
Eighth, the appellant contends that “[l]ethal injection results in the unnecessary and gratuitous infliction of pain in violation of the Eighth Amendment.” (Appellant’s brief at p. 117.) This argument is not properly before this court because he raises it for the first time on appeal.[16] See Morrison, supra.
I.
Ninth, the appellant contends that he was deprived of the effective assistance of counsel based on the trial court’s denial of funds for a proper ballistics expert. In its order on the petition, the circuit court found as follows:
“To succeed in proving an ineffective assistance of counsel claim, the petitioner must prove that his counsel’s performance was deficient and that the outcome of his trial was prejudiced as a result. See Strickland v. Washington, 466 U.S. 668 (1984). As discussed above, Hinton has not alleged how he was prejudiced by the testimony of his ballistics expert at trial. In addition, *313 •the trial court gave Hinton leave to ask for funds in excess of the $1,000 already granted for a ballistics expert. (T.R. 10) This claim is completely without merit, however, because ineffective assistance of counsel is viewed from the actions of counsel and not the actions of the trial court. Hinton is stating a claim for a due process violation under the Fourteenth Amendment; however, this alleged due process violation is proeedurally barred as it could have been, but was not, raised at trial. Cf. Bui v. State, 717 So.2d 6, 27 (Ala.Crim.App.1997).”
(C.R. 1643-44.) The record supports the circuit court’s findings, and we adopt them as part of this opinion.
Moreover, as set forth previously in this opinion, Payne gave very thorough testimony regarding his qualifications, the functioning of firearms, and toolmark identification. He also testified unequivocally that the Davidson, Vason, and Smother-man bullets had not been fired from the revolver that was recovered from the appellant’s mother. Finally, he apparently assisted 'trial counsel so that he could extensively cross-examine the State’s firearm and toolmark experts. In contrast, as set forth above, the testimony of the appellant’s Rule 32 experts was not as favorable as Payne’s unequivocal testimony. Therefore, the appellant has not established that he was denied the effective assistance of counsel in this regard. Accordingly, he is not entitled to relief on this claim.
For the above-stated reasons, the circuit court properly denied the appellant’s petition. Accordingly, we affirm the circuit court’s judgment.
AFFIRMED.
McMILLAN, P.J., concurs.
WISE, J., concurs specially, with opinion.
COBB and SHAW, JJ., dissent, both with opinion.

. In her dissent, Judge Cobb notes that, "[d]uring cross-examination, the prosecutor established that Payne had difficulty operating the microscope at the State forensics lab.” 172 So.3d at 321. However, when he was asked about this during his deposition, Higgins stated: "[0]n the scope we had at that time, unless you were familiar with that model, you would need someone familiar with it to show you. I mean that would be — that could happen to anyone.” (C.R. 2210.)

. However, during questioning by the circuit court, Emanuel admitted that they tested only one of the revolver’s cylinders rather than all of them because they thought it had the worst out of time problem and it would probably produce the worst example of an out of time bullet fired from that revolver. He also admitted that there were indications that the revolver had been cleaned before he examined it.

. In her dissent, Judge Cobb apparently relies on this passage to conclude that Emanuel *270 testified that the revolver that was recovered from the appellant’s mother "could not have fired State’s Exhibit 54 from the Smotherman shooting.” 172 So.3d at 320 n. 25. However, a closer examination of his testimony reveals that such an interpretation overstates his testimony. In response to the first question quoted above, Emanuel carefully limited his answer and stated that he did not believe that the revolver was capable of producing a bullet like State’s Exhibit 54 "if it's fired normally without some type of external manipulation.” (R. 86.) In response to the second question quoted above, Emanuel indicated only that, even when manipulating the revolver, he could not produce a bullet that was comparable to State’s Exhibit 54.

. Cooper testified that the revolver showed very little out of time slippage when it was fired in the single action mode and that it showed more when it was fired in double action mode.

. In her dissent, Judge Cobb apparently relies on this passage to conclude that Cooper testified that, in his opinion, the Smotherman bullets could not have been fired from the revolver that was recovered from the appellant's mother. However, a closer examination of his testimony reveals that such an interpretation overstates his testimony. In response to the first question quoted above, Cooper indicated only that, even when he manipulated the revolver, he could not produce a bullet that looked like State’s Exhibit 54. In response to the second question quoted above, Cooper carefully limited his answer. Although the appellant's counsel asked Cooper if it was his opinion that the revolver’s mechanical condition made it impossible for the revolver to produce a bullet like State’s Exhibit 54, Cooper specifically limited his answer and stated that, in the testing in which he was involved, he could not reproduce what happened to the Smotherman bullets. That is a far cry from saying that the revolver could not have produced the Smotherman bullets.

. At one point during the State’s cross-examination, Cooper expressed confusion about the questions being asked and stated that it was his opinion that the Smotherman bullets could not have been fired from the revolver that was recovered from the appellant’s mother because of “the mechanical inability of this weapon to produce a bullet of that nature.” (R. 123.) However, on redirect examination, the following occurred:
"[THE APPELLANT’S COUNSEL:] With regard to the examination you made with the weapon where it was out of time, just so I’m clear that we all understand
*272 your testimony, it's your testimony that whatever the weapon is that fired State’s Exhibit 54 would have been more severely out of time than what you were able to make this weapon, State's Exhibit 79, fire; is that correct?
"[COOPER:] That's correct.
"[THE APPELLANT'S COUNSEL:] And so any variation between its most extreme out of time firing and its most precise in time firing wouldn’t get you a bullet that looked like State’s Exhibit 54?
"[COOPER:] We could never reproduce that.”
(R. 129-30.) Finally, on recross-examination, the following occurred:
"[STATE’S COUNSEL:] And your belief that State's Exhibit 54 did not come from State's Exhibit 79 comes based on your examination of the skidding or the out of time characteristics.
"[COOPER:] It’s based on the inability of that weapon being able to produce a bullet of that type.”
(R. 130-31.)
In her dissent, Judge Cobb also apparently relies on these passages to conclude that Cooper testified that, in his opinion, the Smother-man bullets could not have been fired from the revolver that was recovered from the appellant's mother. However, Emanuel testified that they, tested only one cylinder of the revolver, and Cooper testified about the safety and strength limitations on the testing. Also, Cooper specifically and repeatedly qualified his testimony by stating that they had not been able, in their testing of the revolver, to produce a result that looked like State's Exhibit 54.

. In her dissent, Judge Cobb notes that “two of the witnesses testified that the ethics code for the Association of Firearms and Toolmark Examiners requires that examiners confer before a case goes to court if they have reached different results in testing. (R. 107, 145.) . Emanuel testified that, based on the ethics code, he asked Lawden Yates if he would show Emanuel what he had seen and how he had determined that the six crime-scene bullets were fired from the same gun. Yates refused to do so.” 172 So.3d at 324. In Judge Cobb's view, Emanuel and Cooper testified that the revolver that was recovered from the *273 appellant's mother could not have fired one or both of the Smotherman bullets. Oppositely, Dillon testified that he could not determine whether or not the Smotherman bullets had been fired from the revolver that was recovered from the appellant’s mother. Interestingly, however, the record does not indicate that these experts conferred concerning their "differing results,” thus lending further support to the conclusion that Judge Cobb’s dissent overstates Emanuel’s and Cooper's testimony.

“2 Raymond Cooper testified that he was able to exclude the bullet in Exhibit # 54 as having been fired from the gun recovered at Hinton’s mother’s house because he could not get the gun to fire a bullet with as much skidding as there was on # 54. (R. 120-121) However, Lannie Emanuel admitted that they only tested one cylinder. (R. 90) Cooper and Emanuel testified that they tried to hold it open with one hand, which was very dangerous and impossible to do. (R. 83, 120-122)”

. To the extent the appellant appears to argue that the trial court appointed only one attorney to represent him and paid counsel for only one case, his arguments are precluded because he could have raised them at trial and on direct appeal, but did not. See Rule 32.2(a)(3) and (5), Ala. R.Crim. P.

. Although Perhacs indicated that he contacted several experts whom he would have considered qualified, he did not testify that any of them actually would have refuted the testimony of the State's experts. Moreover, during the Rule 32 proceedings, the appellant did not present any evidence that any of the referenced experts actually would have been more qualified than Payne.

“39At the time of Mr. Hinton’s trial, the statute provided reimbursement to appointed counsel for any expenses reasonably incuiTed in the defense of his client, ‘to be approved in advance by the trial court.’ Ala.Code § 15 — 12—21(d) (1975).”

. In her dissent, Judge Cobb notes that counsel appeared not to be aware of the amendment even in 2002 when he testified during the evidentiary hearing. In fact, during the evidentiary hearing, the appellant’s counsel stated: "The only way he can make that showing [that he was denied the effective assistance of counsel due to inadequate funding for experts] is by demonstrating what would have been done if the limitations did not exist.” (R. 45.) Thus, it appears that, during the evidentiary hearing, even the appellant's counsel believed that the limitations *286 were still in place at the time of the appellant’s trial.

“21Counsel needed to know what funds would be available to him at the outset. Mr. Perhacs knew that representing Mr. Hinton would necessarily cost him money that would not be reimbursed. Mr. Perhacs articulated pretrial:
“ ‘If the State of Alabama would pay me the deficiency that I incur after I’m paid the fees in these cases, you know, I probably would be more selective, only take the ones that I knew I would easily prepare. But, you know, when this thing boils down, I spend money to prepare this thing... And you have to argue about getting more than a thousand dollars in these cases. ... [B]y the time I’m done, I’ve paid my investigator a couple of grand in these cases.’
“(R. 74.) Assurance that funds would he available were simply not made. Consequently, Mr. Perhacs was forced to operate on the promised ‘$500 per case’ even though more money could have been authorized. Ala.Code § 15-12-21(d) (1975) (amended to provide reimbursement if ‘approved in advance by the trial court.’)

“22Perhacs filed a Request for Approval of Extraordinary Expenses. (R. 1997, 2115.) This Court granted $500 for each case. (R. 2118.)”

“29Although Ala.Code § 15-12-21(d) (1975) previously limited expert fees to $500, Act No. 84-793, 1984 Ala. Acts 1st Ex.Sess., p. 198, effective June 13, 1984, amended that section to provide reimbursement to appointed counsel for any expenses reasonably incurred in the defense of his/her client, ‘to be approved in advance by the trial court.’ ”

. In her dissent, Judge Cobb relies heavily on its judgments that "Payne was soundly discredited”; that "[t]he prosecutor’s cross-examination of Payne was devastating and it virtually destroyed Payne’s credibility"; that ”[t]he prosecutor completed that destruction in his closing argument”; that "the prosecutor effectively called the jury's attention to Payne’s lack of experience and qualifications, the errors he made during his examination of the evidence, and that he had only one eye”; that the prosecutor "cast Payne as a charlatan who was completely lacking in credibility and unworthy of belief”; that "Payne was mocked and represented to be no better than a buffoon and a paid liar”; and that ”[t]he testimony on the only physical evidence that connected Hinton to any of the crimes was useless to him because it was delivered by a witness who was not qualified or competent to render the opinions” to conclude that Payne was unqualified or incompetent and that counsel rendered ineffective assistance for proceeding to trial with him as an expert. 172 So.3d at 322. However, these are judgment calls and credibility determinations that are simply not appropriate for this court to make. Rather, after the trial court initially recognized Payne as an expert, it was the function of the jury to determine his credibility. In this regard, during the evidentiary hearing, the following discussion occurred:
“THE COURT: Let me say this. Mr. Payne has been recognized or was recognized as an expert and testified both in civil and criminal courts all over the state.
"[THE APPELLANT'S COUNSEL]: Well, he was characterized by the state at trial, Your Honor, as a charlatan, as someone who didn't know anything about this kind of testimony. He was mocked.
"THE COURT: Oh, well, I see that on experts quite often by either side.”
(R. 25.)

. See Part I.A., supra, for a discussion about the limited .nature of the testimony and the carefully phrased conclusions of the appellant’s Rule 32 experts.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)

“4At the time of Hinton’s trial in 1986, there was no requirement that voir dire be transcribed. Alabama Rule of Criminal Procedure 19.4(a) required court reporters to transcribe voir dire examination of the jury and it did not become effective until January 1, 1991. See Boyd v. State, 746 So.2d at 382.”

“5Veniremembers A.H., V.H., and B.W. were removed for cause due to family concerns. (R. 253, 259, 326)”

. The appellant's argument that counsel rendered ineffective assistance on appeal because he did not challenge the denial of funds necessary to protect his rights is not properly before this court because he did not first present it to the circuit court. See Moirison v. State, 551 So.2d 435 (Ala.Crim.App.1989).

. In the circuit court, the appellant challenged execution by electrocution.